STATE, *ex rel.* ARTHUR G. CUMMER, v. J. E. PACE as City Auditor, Jacksonville, *et al.*

164 So. 723.
Opinion Filed December 10, 1935.

*George M. Powell,* for Relator.

*Austin Miller* and *Gov Hutchison,* for Respondents.

BUFORD, J.—This is the second appearance of this case here. See State, *ex rel.* Cummer v. Pace, City Auditor, *et al.,* 118 Fla. 496, 159 Sou. 679.

It comes before us now on demurrer to the several paragraphs of the amended answer and return to the alternative writ of mandamus. The controlling question for our determination is whether or not paragraph XIII of the answer is sufficient to overcome the infirmities pointed out in the answer as it stood on the sustaining of the demurrers by the opinion and judgment above referred to. Paragraph XIII of the answer is as follows:

Further answering said alternative writ, and each and every part thereof, these respondents say that the information sought by relator, as shown by his letter of July 6, 1934, addressed to the respondents herein, and set forth in paragraph V of the alternative writ, to-wit, all information shown by 'the Municipal Records and Books of Account of

the said City of Jacksonville, covering the period from the first day of January, 1914, to date,' comprehends and includes certain information concerning the nature, kind, quantity, destination, consignee and routing of property tendered or delivered to said Municipal Docks and Terminals by shippers and consignees patronizing the same the disclosure of which information to any person or corporation whatsoever, other than the shipper or consignee thereof, without the consent of such shipper or consignee, is prohibited by paragraphs 11 and 12 of Section 15 of the Interstate Commerce Act of the Uniten States, hereinbefore referred to, because such information may be used to the detriment or prejudice of said shippers or consignees and improperly disclose certain business transactions of said shippers or consignees to their competitor or competitors, in that:

"(a) Among other services rendered by respondents in the operation of said Municipal Docks and Terminals the respondents are frequently called upon to act as agents for both shippers and consignees, and, as such agents are required to receive certain goods from certain shippers engaged in interstate commerce and deliver the same to purchasers or consignees thereof and collect and remit to the shipper the shipper's agreed prices therefor. Among the municipal records and books of account, access to which is sought by relator, are records showing the agreed prices charged by said shippers and paid by said purchasers for said goods, as well as the date of such shipment, the name and address of the shipper and consignee thereof, and much other data of a strictly private nature, all of which could be used to the detriment or prejudice of such shippers or consignees by the relator or other competitors of said shippers or consignees in the same line of business for the

purpose of rate cutting and underselling said shippers and thereby depriving them of profitable business connections of a private nature already well established.

"(b) From time to time shippers engaged in interstate commerce using the facilities of respondents' Municipal Docks and Terminals use the same for the purpose of shipping newly discovered fields in different parts of the world to certain consignees for experimental purposes, which goods, if proven satisfactory, will be later required in vast quantities, thereby developing a profitable trade for the discoverer thereof; and among the books and records of said Municipal Docks and Terminals, access to which is sought by relator, are certain records concerning the nature, kind, quantity, destination and consignee of such goods, which information might be used to the great detriment of such shipper or consignee by the relator or other competitor by enabling them to acquire information as to such newly discovered source of supply for themselves before the original discoverer thereof had an opportunity to develop the same, and thus deprive said shipper or consignee of the profits which could have been made by them had not such information been disclosed, as sought by the relator.

"(c) The respondents in the operation of said Municipal Docks and Terminals customarily serve as agents for various shippers, consignees and steamship lines employed in interstate commerce and using the facilities of said docks and terminals; that among the books and records, access to which is sought by the relator, are complete copies of numerous steamship cargo manifests showing the marks, nature, kind, quantity, destination, consignee and routing of said goods, all of which information was furnished the respondents as such agents by said patrons as confidential information, not to be divulged to anyone, and to be used by

respondents only in the necessary handling and forwarding of said cargoes. Such information is improper to be disclosed to the relator, who is a competitor in the same line of business as respondents and could be used by relator and other competitors to the detriment and prejudice of such shippers or consignees of respondents, in that it would enable the relator as agent for competing shippers, consignees and steamship lines to and from the same ports to unfairly solicit and secure freight for their own lines, thereby causing respondents' shippers to lose said business or to incur unnecessary expense in the discharging of cargo.

"(d) Among those patronizing respondents' Municipal Docks and Terminals are certain companies engaged in interstate commerce in the same kind of business as the others, in direct and active competition with each other, each of said companies having its own trade secrets, a large number of which trade secrets are necessarily reflected in the books and records of respondents herein sought to be examined by realtor, by reason of the fact that respondents from time to time act as confidential agents for all such companies and in that capacity acquire said records. To divulge such information to relator as demanded would be highly improper, unfair and detrimental to said shippers engaged in competition with each other, in that relator as agent for competitors of said shippers could use such information to unfairly solicit business and otherwise injure and damage said patrons by depriving them of advantageous contracts and trade agreements and divulging their trade secrets to others.

"(e) The Municipal Docks and Terminals operated by respondents comprehends the only naval stores yard in existence at the port of Jacksonville, Florida, and as a result thereof the respondents' Municipal Docks and Terminals

handle all resin and turpentine shipped into the port of Jacksonville for various factors and buyers in other states of the United States and foreign nations. Among the Municipal records and books of account, access to which is sought by relator, are complete confidential records concerning the nature, kind, quantity, destination, consignee, routing and agreed price of said naval stores, all of which information was received by respondents as operators of said Municipal Docks and Terminals in a confidential capacity to be used only in the necessary handling of said shipments; no shipper or consignee of said goods has ever consented that any of said information should be disclosed to anyone in general or to the relator in particular, and to disclose said information without the consent of said shippers or consignees would work to the detriment or prejudice of such shippers or consignees, in that the relator or persons to whom said information was disclosed could improperly solicit said goods and avail themselves of trade secrets thereby acquired to their own advantage, thereby causing said shippers and consignees to suffer losses of revenues and profits.

"(f)   There are several competitive steamship lines operating to and from the United Kingdom, continental ports, South American, Porto Rican, Pacific Coast, coastwise, and other world ports and the port of Jacksonville; certain of said steamship lines patronize the respondents' Municipal Docks and Terminals for the purpose of loading and discharging their cargoes at the port of Jacksonville. Certain others of said steamship lines patronize the facilities of Commodores Point Terminal Corporation, of which relator is President; said steamship lines using the facilities of the respondents' Municipal Docks and Terminals having trusted the respondents with certain information and records of a private and confidential nature concerning the na-

ture, kind, quantity, destination, consignee, routing, agreed prices and other factors of property and goods handled by said steamship lines have never consented that the same be disclosed to any person or corporation whatsoever. Said information, if disclosed, could be used to the detriment and prejudice of such steamship lines by allowing the person to whom said information was disclosed to avail himself of said information in the conduct of a similar business so as to cause said steamship lines using respondents' facilities to lose business, to be compelled to make less advantageous rates, or to be put to additional expense in leading or discharging said cargo; said information is improper to be disclosed to the relator herein, because relator, as President of the Commodores Point Terminal Corporation is engaged in direct competition of your respondents in serving certain other steamship lines.

"(g) That no shipper or consignee using the facilities of respondents' Municipal Docks and Terminals has ever consented for any information whatsoever concerning the nature, kind, quantity, destination, consignee or routing of any property tendered or delivered by them to respondents' Municipal Docks and Terminals for interstate transportation to be disclosed to anyone. Upon the contrary, as hereinbefore stated, such information has uniformly been given to respondents confidentially and to be used only by respondents in the necessary handling of cargoes. In fact, certain patrons of respondents' Municipal Docks and Terminals after the issuance of the writ herein, have warned the respondents that if respondents open to relator said books and records concerning such confidential transactions with such patrons that they would be injured thereby and would seek redress; and the respondents are advised that as

a matter of law the respondents would be liable in damages at law to all shippers or consignees thereby damage.

"Wherefore, respondents say that said information contained among the books and records, access to which is sought by relator, is improper to be disclosed to any person or corporation whatsoever for the reasons given, and is particularly improper to be disclosed to the relator herein, because relator is a direct competitor of the respondents and is constantly serving as confidential agent for shippers and consignees who are in direct competition with shippers and consignees served by the respondents, in that such disclosure, without their consent, would injure respondents' shippers and consignees in the profitable transaction of their business, and make it impracticable for them to continue to carry on their affairs."

The controlling federal statute being paragraphs 11 and 12 of Secton 15 of the Federal Transportation Act, U. S. Code Annotated, Title 49, will be found quoted in the former opinion.

The legislative Act upon which the relator relies is Section 424 R. G. S., 490 C. G. L., which is as follows:

"Public Records Open to Examination by Citizens.—All State, county and municipal records shall at all times be open for a personal inspection of any citizen of Florida, and those in charge of such records shall not refuse this privilege to any citizen."

On October 3, 1912, the Legislature of Florida was convened in Special Session and enacted Chapters 6415 to 6420, inclusive. Section 6415 was an Act to authorize and empower the City of Jacksonville to acquire, own, conduct, equip, operate, lease and control Municipal Docks and Terminals, including railroads; etc. Chapter 6415 granted certain submerged lands to the City of Jacksonville and

granted certain other powers to the City of Jacksonville in connection with the Municipal Docks and Terminals above mentioned. The remaining chapters had to do with the paying of the expenses of the legislative session. Section 1 of Chapter 6415 is as follows:

"The City of Jacksonville, a municipal corporation existing in the County of Duval, under the laws of the State of Florida, is hereby fully authorized and empowered by condemnation or otherwise to acquire, own and use in manner hereinafter provided, municipal docks and terminals, including railroads, deemed suitable to meet the present and future needs of the commerce of the city and promote the growth and development of the city and welfare of its citizens; and the city is hereby fully authorized and empowered to provide for the improvement, maintenance, operation and management of such docks and terminals, including railroads and to do any and all things within and outside the city limits reasonably necessary or advantageous to be done in connection with the acquiring, improving, maintaining, operating or management of such docks and terminals, including railroads, looking to the meeting of needs of commerce of the city and development of the city and the welfare of its citizens, and for these purposes are hereby specifically granted all powers of eminent domain. The decision by the affirmative vote of three-fifths of all members of the Board of Port Commissioners hereinafter provided for, or their successors, or three-fifths of the members of any municipal board which may hereafter be charged by statute with the control and management of such docks and terminals, entered of record on the minutes of the meetings of such board, shall constitute prima facie evidence of the reasonable necessity for

or advantage of the doing of anything hereinbefore authorized to be done when necessary or advisable to be done."

Section 2 of the Act provided for an election to authorize the issuance of bonds in the sum of One Million, Five Hundred Thousand ($1,500,000.00) Dollars to raise funds with which to acquire municipally owned docks and terminals. The remainder of the Act had to do with the bonds and expenditures of the fund.

It will be observed that it was clearly the legislative intent to authorize the City of Jacksonville to engage in the business of a common carrier in interstate commerce. The answer and return show that this intent has been fully realized and that the respondent is engaged as a common carrier in interstate commerce.

Section 424 R. G. S., 490 C. G. L., must be deemed and held to be insofar as this case is concerned, limited by the provisions of paragraph 11 of Section 15, title 49, U. S. Code Annotated, *supra,* and when so limited the provisions of the state statute will not be construed to apply to the records of a common carrier in interstate commerce which contain information concerning the *nature, kind, quantity, destination, consignee,* or *routing* of any property tendered or delivered to such common carrier for interstate transportation, which information may be used to the detriment or prejudice of any shipper or consignee or which may improperly disclose the business transactions of such shipper or consignee to a competitor.

In the absence of any showing on the legislative record to the contrary it must be assumed that when the Legislature of Florida granted to the Municipality of Jacksonville the power and authority to own, operate, control, and conduct municipal docks and terminals, including railroads and other transportation facilities, it was the intent of the Leg-

islature that the Municipality of Jacksonville should be clothed with all the powers and circumscribed by all the limitations applied by law to other persons or corporations engaged in like business and all shippers and consignees transacting interstate commerce through the Municipal docks and terminals so authorized and created had a right to rely upon the application of all laws applicable to common carriers in interstate transportation. Analogous case, City of Sebring v. Avant, 95 Fla. 960, 117 Sou. 383.

In the case of Mushet v. Department of Public Service of City of Los Angeles, 35 Cal. Appls. 630, 170 Pac. 653, it was said:

"The books and papers which the petitioner seeks to examine by means of this proceeding are described in his petition as 'all books of account, records, papers and other documents and kept by the department of public service of the city of Los Angeles which would in any manner explain the items of expenditure and for what the same were expended, by or under the authority of the board of public service commissioners, or otherwise, of any and all sums of money expended, or ordered or authorized to be expended, by said board of public service commissioneres, or said department of public service, or either of them, from either of' two funds mentioned elsewhere in the petition as arising from certain bond elections in the city of Los Angeles, expenditures from which funds were under the control of appellants, and which expenditures were to have been made for the acquisition and construction of works for generating and distributing electricity for the inhabitants of the city. Returning to the language of Sections 1894 and 1888 of the Code, it is plain that the books and papers mentioned in the petition are not described in either subdivision 1, 2, or 4 of Section 1894, or subdivision 2 of

Section 1888. If the sections cover them at all they must fall within the language of the one remaining subdivision of each; in other words, consolidating the language of those subdivisions, they must answer this description: They must be 'official documents' other than laws or judicial records and must be 'the written acts or records of the acts * * * or official bodies' or 'tribunals' or 'of public officers, * * * of this State.'

"Leaving aside the question, as to which there might be some debate, whether the books and papers in question were written acts, or records of acts, as those terms are used in the statute, we take up the question whether they are official documents. It is conceded by counsel for respondent, and the authorities are plainly to the effect, that in handling the affairs to which these books and papers relate, the appellants are engaged in a private business of the city of Los Angeles. Marin Water & Power Co. v. Town of Sausalito, 168 Cal. 587, 595, 143 Pac. 767. In making the concession mentioned, counsel for respondent says:

" 'I agree, of course, that when engaged in the installation and operation of the municipal electric system, the city is neither more nor less than a private public utility corporation. It is, in other words, an electric corporation, and nothing more, of the city of New York when similarly engaged in the installation and operation of its municipal subway, the Court of Appeals said: The City owns the subway and it is a railroad corporation, so far as the construction, operation and leasing thereof is concerned. * * * In other words, the subway is a business enterprise of the city, through which money may be made or lost the same as if it were owned by an ordinary railroad corporation. It was built by and belongs to the city as a proprietor, not as a sovereign. *In re* Board of Rapid Transit

Commissioners, 197 N. Y. 81, 90 N. E. 456 (36 L. R. A. [N. S.] 647, 18 Ann. Cas. 366).'

"This is a fair statement of the law on the subject. The appellants contend that the books of account and the records, papers and documents pertaining to expenditures made in connection with a business such as is described in the quotation just made from the New York decision cannot, in any sense, be viewed as public documents. It is contended that, as all of the properties and instrumentalities used in the conduct of the business are the private property of the city, the books of account showing the conduct of the business by means of those instrumentalities must also be its private property. This would seem to be a just estimate for the situation. At any rate, we are convinced that the books and papers in question are not public documents, as that term is used in the sections of the Code now under review. The appellants, it is true, are by the charter of Los Angeles made officers of the municipality; but the books and papers which respondent seeks to examine are not made official documents merely because they are kept under the direction of city officials. Their character is fixed by the considerations which we have already advanced.

"The respondent assert that he occupies the same relation to the appellants and to the business conducted by them as a stockholder of an ordinary public utility corporation occupies toward such corporation. He argues that because the stockholder is entitled to access to the books and papers of his corporation, he, the respondent, is likewise entitled to access to the books and papers kept by appellants. The right of a stockholder of an ordinary corporation to open the books of his corporation is a right which existed at common law as an incident to his interest in the corporate enterprise. Hobbs v. Tom Reed Gold Min. Co., 164 Cal.

884

497, 501, 129 Pac. 781, 43 L. R. A. (N. S.) 1112. Before we proceed to consider the point made by respondent, let us state another rule of law, the appositeness of which does not now appear, but will immediately be shown to exist. At common law every interested person was entitled to the inspection of public records. 24 Am. & Eng. Ency, 182; People v. Cornell, 47 Barb. (N. L.) 329; Brewer v. Watson, 71 Ala. 299, 46 Am. Rep. 318; State v. King, 154 Ind. 621; 57 N. E. 535; Clement v. Graham, 78 Vt. 290, 63 Atl. 146. Respondent invokes an analogy, in the matter of the right to inspect records, between the situation of a stockholder with reference to his corporation and the situation of respondent himself with relation to the appellants, and an analogy may also be claimed under the rule of the common law last stated. That analogy is between the situation of a citizen as to public records which he has not the right by a statute to inspect and the situation, again, or respondent with relation to the books and papers of appellants. The principle behind the rule of the common law to the effect that a stockholder of an ordinary corporation has an inherent right to inspect the corporate books and papers also demands the extension of the same right to respondent in connection with the books and papers of appellants."

And further, in the same opinion, it is said: "In short, the analogy claimed by the respondent is perfect. Reason requires the application of both of the stated rules of the common law to his relationship to the books and papers kept by appellants. Therefore, as the public ownership of utilities did not come into any considerable vogue in the British Isles until about 1835 (Dillon's Munc. Corp. 5th Ed. Sec. 1292), a time long after the promulgation of the two rules of the common law to which we have so often referred, to see, in the situation now before us, a new condi-

tion of affairs, uncontemplated at the time those rules sprang into being, but to which they must be held to have a distinct application. We have no doubt of our right to make this application. The rules of the common law will be applied to those cases which come within their reason and equity, even when such cases seem to be outside the strict letter of such rules as they are ordinarily stated. The terminology employed in the enunciation of the principles of the common law had its rise in conditions existing at the time of such enunciation. As new situations are discovered, strict terminology will be relaxed, and it will be determined, accordingly, that such situations either do or do not come within the rules, as their true spirit and equity may direct and require. These statements find general support in Katz v. Walkinshaw, 141 Cal. 116, 123, 70 Pac. 663, 74 Pac. 766, 64 L. R. A. 236, 99 Am. St. Rep. 35; San Joaquin Kings River Co. v. Fresno Flume Co., 158 Cal. 626, 629, 112 Pac. 182, 35 L. R. A. (N. S.) 832; Martin v. Superior Court, 168 Pac. 135, decided October 11, 1917. If it shall appear to the trial court upon the hearing of evidence under the issues presented by the pleadings, that the respondent is not acting for the Los Angeles Gas & Electric Corporation, but upon his own interest as a citizen, then application will be made of the rules of the common law to which we have adverted."

In Barrickman v. Lyman, City Engineer, *et al.*, 155 Ky. 710, 160 S. W. 267, on rehearing, it was held:

"In the petition for rehearing counsel give the opinion a wider scope than we intended. (See Barrickman v. Lyman, 154 Ky. 630.) Section 2775, Kentucky Statute, has no reference to any papers or memoranda kept by the officers of the City of Louisville, unless they are required by law to be so kept by such officers. It includes only official papers,

proceedings and records of the officers and general councils of the city, which the law requires them to keep. They are public officers and all records which the law requires them to keep as such officers are by the statutes made public records. Being public records, they are subject to inspection by the public; and this is true although the person demanding the inspection may desire to inspect the record with the view to bringing a suit against the city; but if the officers have in their possession any papers or memoranda which are not required by law to be kept by them as official records, such papers and memoranda are not public records and are not subject to inspection by the public. The ordinances of the city enacted pursuant to the statute governing it are part of the laws in force there, and a record kept by an officer of the city in obedience to a valid city ordinance is a public record no less than one kept in obedience to the statute. On the return of the case to the circuit court, the demurrer to the petition will be overruled; but if the defendant desires it, the plaintiff will be required to make her petition more specific and show the particular records she desires to inspect; so that the court may enter a judgment for the inspection of only such records as are public records and the judgment shall be sufficiently definite for the defendant to obey it intelligently."

By quoting excerpts from the above cited opinions we do not seem to approve all that is said therein, but they are cited and quoted only for the purpose of approval insofar as the conclusions reached by us in this case are supported.

The conclusion which we reach is that the allegations of paragraph XIII of the answer and return, when taken together with the other allegations contained in the answer and return, are sufficient to show that the relator is not entitled to have access to, or inspection of, those particular

records of the Municipal Docks and Terminals of the City of Jacksonville containing information concerning the nature, kind, quantity, destination, consignee, or routing of any property tendered or delivered to such common carrier for interstate transportation, which information may be used to the detriment or prejudice of any shipper or consignee or which may improperly disclose the business transactions of any shipper or consignee to a competitor.

Therefore, demurrer to the amended answer and return should be overruled.

It is so ordered.

Demurrer overruled.

ELLIS, P. J., and TERRELL, J., concur.

WHITFIELD, C. J., and BROWN and DAVIS, J. J., concur in the opinion and judgment.