66 So.2d 653 (1953)
GATE CITY GARAGE, Inc., et al.
v.
CITY OF JACKSONVILLE.
Supreme Court of Florida, en Banc.
July 10, 1953.
Rehearing Denied July 30, 1953.
*654 Patterson, Freeman, Richardson & Watson, William A. Hallowes, III, and Damon G. Yerkes, Jacksonville, for appellant.
William M. Madison, Jacksonville, for appellee.
MATHEWS, Justice.
This is an appeal from a final decree of the Circuit Court of Duval County validating an issue of $3,265,000 of municipal parking revenue bonds. Chapter 24611, Sp.Laws of Florida 1947, as amended by Chapter 27635, Sp.Laws of Florida 1951, authorized the city to issue such bonds and the city has acted under this special statutory authority.
At the time each of the Special Acts above mentioned was enacted, the City of Jacksonville had in operation a system of controlling or regulating on-street parking by meters.
The regulation of motor vehicular traffic on the streets of the larger municipalities of the State is one of the major problems yet to be solved. Traffic congestion is on the increase. A greater portion of the commercial activities of municipalities is concentrated generally within a space of a few blocks. City halls, court houses, theaters, banks, office buildings, retail commercial establishments of every kind, are generally located in what is called "downtown." If those who use automobiles in order to attend to their business, cannot park them, then the value of such automobiles for such use becomes negligible. On-street parking in the larger municipalities affords some relief, but with increasing population and increasing use of automobiles, such on-street parking with the use of meters is wholly inadequate and congestion is now becoming more intolerable *655 In recognition of the conditions which existed in the City of Jacksonville, the Legislature in Section 1 of Chapter 24611, supra, made the following declaration and determination:
"Section 1. The Legislature hereby determines and declares that excessive curb parking of motor vehicles on roads and streets in the City of Jacksonville and the lack of adequate off-street parking facilities in said City create congestion, obstruct the free circulation of traffic, diminish property values, and endanger the health, safety and general welfare of its citizens; that the provision of conveniently located off-street parking facilities attractive in cost and the simultaneous control of curb parking by said City are therefore necessary to alleviate such conditions; and that the establishment of off-street automobile parking facilities is deemed to be a proper public or municipal purpose of said City." (Emphasis supplied.)
In addition to the declaration and determination by the Legislature in the Acts above set forth, the City Council of the City of Jacksonville, by Ordinance No. CC-192, Art. I, 1.01(B), made the same declaration, findings and determination.
The authority of the city to issue bonds, provide for the payment of principal and interest of such bonds, to acquire property and maintain off-street automobile parking facilities as a part of the plan or system is fully covered by Chapter 24611, Sp. Laws of Florida, 1947, as amended by Chapter 27635, Sp.Laws of Florida 1951.
The appellants, who are proper parties, question the validity of the Special Acts involved.
In approaching this subject we should recognize the clear distinction between Acts of the Legislature vesting power and authority in a municipality, and ordinances of the municipality enacted pursuant to such legislative authority.
The Legislature has plenary power over municipalities, subject only to restraints or prohibitions of the organic law. State v. Johns, 92 Fla. 187, 109 So. 228; City of Orlando v. Evans, 132 Fla. 609, 182 So. 264; State v. City of Miami, 103 Fla. 54, 137 So. 261.
The municipality can exert only those powers granted to or vested in it by the Legislature, and such other powers as may be necessary to properly exercise or carry out the power specifically granted. City of Daytona Beach v. Dygert, 146 Fla. 352, 1 So.2d 170, 133 A.L.R. 1237; State v. City of Miami, 155 Fla. 180, 19 So.2d 790, 1 A.L.R.2d 132. The fountainhead and source of all municipal power or authority is the Legislature. Therefore, the first and most important consideration in this case is the validity of the statutes.
Section 3 of Chapter 24611, Laws of Florida, Special Acts, 1947, is as follows:
"The City of Jacksonville is hereby authorized to acquire, construct or cause to be constructed, own, maintain and operate off-street automobile parking facilities, and all such improvements and buildings as said City may deem necessary or desirable in connection therewith; * * * to acquire by purchase, gift, lease, bequest, devise, grant, or condemnation in the manner from time to time provided for the exercise of the right of eminent domain, such property, real or personal, or any interest therein, above, at or below the surface of the earth, as it may deem necessary or desirable for such purpose; and said City may charge and collect reasonable fees or rentals for the use or enjoyment of such parking facilities, and may prescribe reasonable rules and regulations for the use and operation thereof."
Section 4 of Chapter 24611, Sp.Laws of Florida 1947, as amended by Chapter 27635, Sp.Laws of Florida 1951, provides as follows:
"Section 4. The City of Jacksonville is hereby authorized to finance the planning, design, acquisition of property for, construction, alteration, enlargement, maintenance or operation of off-street automobile parking facilities *656 by any one or any combination of the following methods:
* * * * * *
"(b) Revenue Certificates or Bonds payable solely out of revenues derived from such parking facilities in the manner provided by its Charter; or Revenue Certificates or Bonds payable out of revenue derived from such parking facilities and all or such part of on-street parking meter revenues as may be pledged by ordinance as additional security for the payment of such Revenue Certificates or Bonds in the manner provided by its Charter;
* * * * * *
"(d) Parking fees and special charges derived from the use of such parking facilities by motorists, lessees, concessionaries or others;
"(e) General fund appropriations to the extent deemed necessary or desirable for such purpose;
* * * * * *
"(g) Parking meter revenues; and * * *." (Emphasis supplied.)
Section 8 of Chapter 24611, Sp.Laws of Florida 1947, as amended by Chapter 27635, Sp.Laws of Florida 1951, provides in part as follows:
"Section 8. Revenue Certificates or Bonds payable solely out of revenue derived from off-street automobile parking facilities, or Revenue Certificates or Bonds payable out of revenue derived from such parking facilities and all or such part of on-street parking meter revenues as may be pledged by ordinance as additional security for the payment of such revenue certificates or bonds, as authorized to be issued by Section 4 of this Act, may be issued without submitting the issuance of same to a referendum as provided by any other law affecting the City of Jacksonville; * * *."
It is urged by the appellants that the plan to acquire and establish off-street parking facilities and to issue bonds payable solely from a pledge of net revenues to be derived from such facilities and the pledge of the gross revenues to be derived from its on-street parking meters as additional security to the extent necessary, violates Sections 1 and 12 of the Declaration of Rights and Section 10 of Article 9 of the Constitution of Florida, F.S.A., in that the plan violates the guarantee of each person of the right to, and the use of, his property; that it amounts to taking private property by public authorities for a use or purpose other than public, and is the taking of a person's property against his will and making it available to another private individual for that person's gain and profit.
Although the legislative determination that the entire plan, including the taking of property by eminent domain, is for a public purpose may not be conclusive upon the Courts, such declaration is very persuasive, and when taken in connection with the purpose sought to be accomplished conditions as they actually exist, of which the Court will take judicial notice, or facts and conditions shown to exist by the pleadings and the facts contained in the record, the Courts may readily determine that the primary purpose, aim and objective of the plan is to serve a public and a municipal purpose.
Two essential powers of government are involved in this case. It is necessary that the city acquire some property from private individuals and the acquirement of such property involves the power of eminent domain. The city is not authorized to exercise this great power unless it is for a public purpose.
In order to carry out the plan it is necessary that public money be used for the acquisition of the land and for the construction of the improvement. If it is not for a public purpose then the City would have no authority to appropriate public funds or to issue bonds to acquire money for the contemplated improvement.
The other governmental power involved in this case is the police power. The regulation of traffic on the streets, the elimination of congestion and hazards to life and property, the safety and convenience *657 of the travelling public constitute a vital part of the police power of municipalities.
The appellants contend that the whole plan is not for a public purpose but is for a private purpose. This question was considered and decided adversely to the appellants in the case of State v. City of Miami Beach, Fla., 47 So.2d 865. In that case the principal and interest of the bonds were payable solely from the revenues derived by the city from the operation of the proposed off-street parking and also the metered on-street parking. One of the questions raised in that case was that the purpose of the bonds was not for a public or municipal purpose but was to enable the city to go into the parking business for gain or profit. The effect of the final decree of the Circuit Court was that there was no merit in this contention and that the purpose of the undertaking was a municipal or public purpose. This Court affirmed the lower Court with a Per Curiam opinion, and in a Special Concurring opinion by Mr. Justice Hobson (which was concurred in by Mr. Justice Sebring), he said:
"It is clear that there is no place in this case for the contention that the City proposes to go into the parking meter or parking facilities business for gain or profit. Therefore I can see no lawful objection to the City of Miami Beach obligating itself to fix rates and collect charges from its parking facilities to meet the obligations of the bonds here under consideration so long as the revenues derived from said parking facilities are used exclusively for retiring the bonds because the proceeds derived from the sale of the bonds are to be used solely for acquiring, equipping, maintaining, and improving existing and additional parking facilities for the City of Miami Beach. This purpose appears to be within the lawful exercise of the police power. Certainly traffic in a city the size of Miami Beach is a proper subject of regulation and it should be systematically methodized."
In the case of Chase v. City of Sanford, Fla., 54 So.2d 370, 373, in re-affirming the Miami Beach case, supra, the Court said:
"* * * The off-street and on-street parking facilities maintained by the City of Miami Beach are part of one general regulatory scheme to control and regulate the tremendous volume of traffic there, and the cost of improving and extending which necessitated the issuance of the bonds there involved. * * *"
In the case of City of Panama City v. State, Fla., 60 So.2d 658, 659, the Chancellor refused to validate the bond issue and dismissed the petition for validation and the decree of the Circuit Court was affirmed. In that case it appeared from the proceedings taken by the city and the petition for validation that the real or primary purpose in issuing the bonds was to provide money with which the City "may reconstruct, pave and improve certain streets or roads within its corporate limits." This primary and dominant purpose was also set forth on the very face of the bonds proposed to be issued. The reconstruction and paving of streets had no connection with the exercise of the police power in using parking meters as an aid in regulating traffic. The constructing and paving of streets cannot be compared with the construction of an off-street parking center as a part of a system which has as its primary purpose the exercise of the police power in regulating or controlling traffic.
Florida is not alone in recognizing and holding that on-street parking meters and off-street parking lots may be combined into one system or plan and that the primary purpose to be accomplished is a municipal and public purpose. In the case of Poole v. City of Kankakee, 406 Ill. 521, 94 N.E.2d 416, 420, the Court said:
"We are aware of the fact that the modern economy and way of life are closely geared to the automobile, which fact has to be kept in mind in many aspects of community planning. A large proportion of urban dwellers today get from one place to another by automobile or other conveyances which *658 use the city streets. Each passing year reveals a continued increase both in the number of urban dwellers and in the number of automobiles on our streets and roads. The result has been to create a problem of national significance, for in many instances the outmoded business streets of cities suffer from a traffic congestion which has strangulated movement and business, directly affected the safety of those who use and cross them, and affected the value and protection of adjacent properties. Ambulance, fire and police vehicles have difficulty reaching the scene of an emergency, while the toll of pedestrians killed on busy city streets seems to increase with each day's news. The economic value of time lost to business because of congested streets can only be surmised. Further, the economic effect of traffic strangulation has been reflected in slumping values of business real estate and a proportionate decline in local tax income. As we view it, there is involved the safety and well being of all the residents of a community so affected. To provide for off-street parking facilities is certainly a step to meet the public need. We are of the opinion that the Parking Act embraces the taking of land for a public use."
See also Bowman v. Kansas City, 361 Mo. 14, 233 S.W.2d 26.
In addition to the special legislative acts authorizing the undertaking involved in this case, the Legislature by the enactment of a general law, F.S. § 183.07, F.S.A., has recognized the importance of an adequate parking system and that such system serves a municipal and public purpose. Said section reads, in part, as follows:
"* * * The council is further authorized to combine into a single project for financing purposes and for the more adequate regulation of traffic and relief of congestion such parking meters or any portion thereof with any parking facilities financed by revenue bonds issued under the provisions of this Chapter and to pledge to the payment of such revenue bonds all or any part of the revenues derived from such parking meters."
The case of State v. Town of North Miami, Fla., 59 So.2d 779, is entirely different from this case. In that case the municipality was attempting to use its power and authority to purchase land and erect industrial or manufacturing plants thereon for the use of a private corporation for private profit and gain. This purpose appeared in all of the proposals and plans. There was not even a claim made that it was in the exercise of the police power. We held that the undertaking did not serve a public or municipal purpose and that it violated Section 10 of Article 9 of the State Constitution because it was an attempt to appropriate public money, or to loan its credit, to a private corporation.
The case of Adams v. Housing Authority of City of Daytona Beach, Fla., 60 So.2d 663, 667, is not similar to the case now under consideration. In that case the housing Authority, in all of its plans and proposals, clearly demonstrated that it was attempting to use the power of eminent domain to acquire private property in order to promote commercial and industrial enterprises and that the primary purposes shown by the proposals or plans was not a public or municipal purpose.
In the case now before the Court, the Legislature has made a finding and determination of fact which, to say the least, is persuasive that the primary purpose of the undertaking is a public and municipal purpose. The City Council, in the passage of the Ordinance hereinabove mentioned, made a similar determination. The able Judge of the Circuit Court, who considered the pleadings, answers, the evidence and matters of which the Court could properly take judicial notice, determined that the undertaking would serve a public and municipal purpose.
We, therefore, hold that the primary aim, objective and purpose of the undertaking is to serve a public and municipal purpose.
The appellants claim, however, that the reservation in the city of the authority to lease a filling station on the property is the equivalent of taking one man's *659 property by public authority and leasing it to another for private gain and, therefore, the entire plan contravenes the constitutional provisions hereinabove set forth. There is no merit in this contention. It is elementary that the city cannot exercise the power of eminent domain for the primary purpose of acquiring private property for a private use for some other person. See State v. Town of North Miami, supra, and Adams v. Housing Authority of Daytona Beach, supra. Constructing and leasing a filling station on a parking lot the size of that contemplated is a mere incident, the primary purpose being to acquire and construct a parking lot to serve a public and municipal purpose. In the case of Adams v. Housing Authority of Daytona Beach, supra, this Court said:
"It should be noted that the plan does not simply provide for the sale or lease of a small portion of the property which may not be needed for housing purposes, and is, therefore, incidental, but it provides for the lease or sale of `all real property within the project area'".
This Court takes judicial notice of the fact that in many municipal and county buildings, such as, city halls and court houses and even the State Capitol, space is leased or concessions are granted to private individuals for the sale of food, magazines, newspapers, public telephones and other things which are mere incidents to the main or primary purpose of the buildings, but are for the convenience of those who use the buildings or facilities for a public purpose. In 18 Am.Jur. in the article on Eminent Domain, Sec. 41, p. 669, the author states:
"The general rule is settled that the exercise of eminent domain for a public purpose which is primary and paramount will not be defeated by the fact that incidentally a private use or benefit will result which will not itself warrant the exercise of the power. * * *"
The appellants next urge that because the Ordinance authorizing the bonds and the parking system provides that the parking system "may be sold, mortgaged, leased, or otherwise disposed of, only as a whole or substantially as a whole" and only then if the net proceeds to be realized shall be sufficient fully to retire all of the bonds issued pursuant to the Ordinance, and further provides that nothing in the Ordinance shall be so construed as to prevent the exercise by the city of its right to lease any part or all of the parking system to private operators; the undertaking is not for a public or municipal purpose and is in effect the reservation of a power to acquire the lands by eminent domain for a public purpose, which may later be used for a private purpose.
There is no merit in this contention. The provisions of the Ordinance are limitations and constitute part of the contract with the bondholders. It is usual for the Legislature to provide for a municipality or a county to dispose of property when it no longer serves a public, county or municipal purpose and to provide for the manner and method of selling such property. Innumerable cases could be cited where lands were badly needed for a public purpose when acquired but changing conditions in later years made such land unsuitable or unnecessary for such municipal purpose. Many statutes could be cited with reference to counties and municipalities, authorizing the sale of lands owned by the cities or counties where such lands were no longer needed for a city, county or public purpose.
In this case there is no legislative authority to sell the land in question or to lease the entire property to some private individual or corporation for private gain. The city can only sell such property pursuant to legal or constitutional authority granted and no such authority has been granted.
The provision complained of in the Ordinance is a part of the bonds and is nothing more than an obligation of the bond and a limitation upon the power of the city (should any such power ever be granted to it by the Legislature), that the city will not sell or lease the property except as provided for in the Ordinance. This provision *660 of the Ordinance does not violate any provision of the Constitution of the State of Florida.
The appellants also contend that the parking system contemplated will compete with private parking operators and is, therefore, for a private purpose or will violate some provision of the State or Federal Constitutions.
There may be public hospitals, waterworks, electric light plants, and other enterprises acquired and operated primarily for the benefit of the public and there may also be private hospitals, waterworks, and electric light plants acquired and operated primarily for private profit and private gain. When the Legislature specifically authorizes a particular undertaking, such as, the parking system involved in this case, and it is found and determined that such system primarily serves a public and municipal purpose, it is not a valid objection that the municipality will be engaged in competition with private business. This question has been definitely settled contrary to the contentions of the appellants in the cases of Hamler v. City of Jacksonville, 97 Fla. 807, 122 So. 220; State ex rel. Cummer v. Pace, 121 Fla. 871, 164 So. 723; State v. City of Tallahassee, 142 Fla. 476, 195 So. 402; Saunders v. City of Jacksonville, 157 Fla. 240, 25 So.2d 648; State v. City of Jacksonville, Fla., 50 So.2d 532.
We find no provision of the State or Federal Constitutions which prohibits a municipal corporation to acquire, own and operate a system such as that involved in this case because it may be in competition with private individuals, firms and corporations.
It is next urged by the appellants that the system authorized by the special acts of the Legislature, the Ordinance of the City Council and the provisions of the bond form, contravene Section 6 of Article 9 of the State Constitution with reference to the issuance of bonds, without the approving vote of the freeholders.
After pledging all of the net revenue from the off-street parking lot, the Ordinance pledges as additional security, the gross revenues received from the city's parking meters to the extent necessary. The Ordinance obligates the city to maintain the parking system in a good condition and to operate the same in an efficient manner. It is then provided that all covenants, agreements and provisions of the Ordinance shall be and constitute valid and legally binding covenants of the city and shall be enforceable by the holder or holders of the bonds to be issued. It is argued by the appellants that if the revenues from the parking meters are at any time insufficient for the purpose of keeping the meters in good repair and working order, a bondholder may obtain a court order requiring a tax levy to pay for maintenance and operation.
It is urged by the appellants that this plan directly, or indirectly, contingently, or otherwise, authorizes the imposition of an ad valorem tax for the purpose of paying a part of the principal or interest of the bonds and, therefore, is in violation of Section 6 of Article 9 of the State Constitution. This contention is without merit.
The city had installed and was maintaining and operating the one-street parking system prior to the time of the enactment of the special laws in question. It was the duty of the city, in the exercise of its police power, to regulate traffic and minimize congestion on the streets of the City of Jacksonville. Public safety required that it do so. The city adopted the on-street parking meter system as one of the means of exercising its police power. As long as on-street parking meters are used by the city for that purpose, it will be necessary that the city pay for the maintenance and operation of such meters, whether the money is obtained from the meters themselves or from some other source provided by the city to maintain its police department and exercise its police powers. The parking meters, which may be termed "silent policemen," as shown by the record, are maintained and operated by the city at a considerable saving in money from that which it would be necessary to pay for the salaries of acting, live, walking policemen. It does not invalidate a bond issue to provide that the gross receipts from the parking meters may be used, if necessary, *661 to pay a part of the principal and interest of the proposed bonds.
The special acts authorizing the system and the financing of the same specifically provide a plain, simple and unambiguous language for the contemplated system and for financing the same in the manner proposed and that such bonds shall be payable or financed "out of revenue derived from such parking facilities and all or such part of on-street parking meter revenues as may be pledged by ordinance as additional security". (Emphasis supplied.)
There is an essential difference between the acquirement or construction of an improvement, and the cost of operation, maintenance and repair of such improvement, after it is once acquired or constructed. Maintenance, operation and repair of municipal property is a duty of the officials and such costs are provided for in the annual budget. The cost of acquiring or constructing a large municipal improvement is generally provided for, as in this case, by bonds.
The record in this case shows that the amount of money raised and appropriated for the Police Department is on an annual basis. It is set up in the annual budget as required by the City Charter. The Legislature may authorize the use of the gross revenues from parking meters for their maintenance, operation and repair or for the extension of the parking system provided for by these special acts, which is nothing more than the exercise of the police power.
The record and pleadings in the case of State v. Florida State Improvement Commission, Fla., 47 So.2d 601, 602, show that the State Board Department obligated itself to pay for the operation, maintenance and repair of two bridges from sources other than tolls derived from their operation. The tolls were pledged to pay the principal and interest of the bonds. It was urged that these obligations pledging the gross revenue from the bridges and agreeing to pay for operation, maintenance and repairs from other sources of the Road Department, in effect, pledged the credit of the State for the payment of a portion of the principal and interest of the bonds and was, therefore, in violation of Section 6 of Article 9 of the State Constitution. This Court in an opinion by Mr. Justice Terrell, rejected this contention and approved the bonds, saying:
"* * * We find nothing in the proceedings that could be construed as pledging the taxing power to service the bonds. State v. State Board of Administration, 157 Fla. 360, 25 So.2d 880; State v. Florida State Improvement Commission, 160 Fla. 230, 34 So.2d 443."
The legal and constitutional use of on-street parking meter funds for the purpose of raising of funds to provide for acquiring, equipping, maintaining and improving existing and additional parking facilities was clearly upheld by this Court in the case of City of Panama City v. State, Fla., 60 So.2d 658, 659, where we reaffirmed our opinion in State v. City of Miami Beach, supra.
Such on-street parking meter funds could not be used to reconstruct, pave and improve streets but could be used and pledged to raise funds to provide for "acquiring, equipping, maintaining and improving of existing and additional parking facilities of the City," under the police power of the city to better regulate traffic in the interest of health, public safety, public convenience and welfare. In the case of City of Panama City v. State, supra, we said:
"It is obvious that the real or primary purpose for the issuance of the proposed bonds is to provide funds with which the City may reconstruct, pave and improve certain streets or roads within its corporate limits. If this were not otherwise clearly apparent it is certainly made so by the language in the form of bond which is attached to the Petition which reads: `This bond is one of an authorized issue of bonds * * *, issued for the purpose of financing the cost of the reconstruction, paving and improvements of streets and roads in said City * *.'

*662 "In the case of State v. City of Miami Beach, Fla., 47 So.2d 865, we approved the validation of a bond issue which had as its purpose the raising of funds to provide for acquiring, equipping, maintaining and improving existing and additional parking facilities for the City of Miami Beach. It is not difficult to consider the acquiring, equipping, maintaining and improving of existing and additional parking facilities as a proper exercise of the police power when such facilities are unquestionably needed and, practically speaking, a public necessity in order to properly regulate parking of automobiles and other vehicles. It is, however, an entirely different matter to broaden the scope of the police power to such extent as to hold that a bond issue may be floated payable from excess parking meter revenues, for the purpose of obtaining funds with which to reconstruct, pave and improve streets and roads in a city.
"The providing of additional parking facilities on or off existing streets when the regulation of vehicular traffic and the parking of vehicles require them is one thing but the reconstruction, paving and improvement of streets and roads generally bears no reasonable relationship to the parking problem of a modern city. * * *"
In the case of Chase v. City of Sanford, Fla., 54 So.2d 370, 373, we said:
"* * * It was held in the City of Miami Beach case that a covenant by the city to fix and maintain rates and collect charges for the use of its off-street and on-street parking facilities sufficient to pay the principal and interest on bonds issued for the purpose of acquiring, equipping, maintaining and improving existing and additional parking facilities was proper. The off-street and on-street parking facilities maintained by the City of Miami Beach are part of one general regulatory scheme to control and regulate the tremendous volume of traffic there, and the cost of improving and extending which necessitated the issuance of the bonds there involved. * * *"
So it is with the case at bar: "The off-street and on-street parking facilities * * are part of one general regulatory scheme to control and regulate the tremendous volume of traffic there, and the cost of improving and extending which necessitated the issuance of the bonds there involved."
The cases cited above recognize the material difference between using funds from on-street parking meters to improve and extend regulatory traffic system as not being illegal and violative of the Constitution, and the diversion of such funds to some other purpose, such as, public docks (in the Sanford case) and reconstructing or paving streets (in the Panama City case) which are illegal and in violation of the organic law.
In the Ordinance, passed pursuant to the special legislative authority, it was provided as follows:
"Neither the Bonds nor coupons shall be or constitute an indebtedness of the City of Jacksonville, within the meaning of any constitutional, statutory or charter limitation of indebtedness, but shall be payable solely from the revenues of the Parking System, including both off-street parking facilities and metered on-street parking facilities, as herein provided. No holder or holders of any Bond issued hereunder, or of any coupon appertaining thereto, shall ever have the right to compel the exercise of the ad valorem taxing power of the City, or taxation in any form of any real or personal property therein to pay said Bonds or the interest thereon."
This same provision is carried forward and inserted in the bond itself and in the final decree entered by an experienced and able Chancellor.
It is, therefore, apparent that the bondholders and everyone else is put upon clear and unmistakable notice that the bonds will be payable solely from the revenues of the parking system, that no lien is created upon any physical property of the City, that the *663 taxing power, as a method or means of paying any part of the principal or interest of the bonds, is specifically excluded, and that the proposed bonds are not bonds within the contemplation of Section 6 of Article 9 of the State Constitution of the State of Florida. State v. City of Miami, Fla., 63 So.2d 333; State v. City of St. Petersburg, Fla., 61 So.2d 416.
The appellants urge that the case of State v. City of Miami Beach, Fla., 47 So.2d 865, should not be considered as authority because they claim there are some substantial distinctions between that case and the one now before the Court. It is claimed that in the Miami Beach case, 47 So.2d 865, the validation proceeding was a mere formality without any real contest. We have reexamined the file, pleadings and briefs in that case and the proceeding was more than a mere formality. The questions presented in that case by the pleadings were considered and passed upon by the Court below and also by this Court, and the case is authority for each question presented and passed upon insofar as such questions are applicable in this case.
The appellants raised the question about the negotiability of the bonds in the instant case. The bond itself provides, "This bond and the coupons appertaining hereto, is, and has all the qualities and incidents of a negotiable instrument under the law merchant and the negotiable instruments law of the State of Florida."
The contention is made that the bonds cannot be negotiable because they do not contain a promise to pay unconditionally and at all events, and the general taxing power is not pledged for their payment. We agree with this contention of the appellee that the bonds do not contain an unconditional promise to pay and that the general taxing power is not pledged. If this had been done, then the bonds would be contrary to Section 6 of Article 9 of the State Constitution. Appellee asserts that if they are not payable unconditionally and the general taxing power is not pledged for their payment, then the bonds cannot be negotiable.
The bond form in the Miami Beach case declared, "This bond is fully negotiable for all purposes." The language in that case was much stronger than the language in the bond form now before the Court. The bond form in this case recites that it has all of the "qualities and incidents" of a negotiable instrument. When it is declared that a bond has all of the "qualities and incidents" of a negotiable instrument and further declares that it is payable solely from a particular fund, then the "qualities and incidents" of the bond are limited by the further provision that notwithstanding the "qualities and incidents" of negotiability, it is limited to the extent that payment can be made only from the special fund and although the bond may be negotiated as a negotiable instrument, the bondholder and all other persons dealing in such bonds are put on actual notice of such limitation.
F.S. § 181.06, F.S.A., is with reference to the terms of refunding bonds of towns and cities, but is persuasive on this question. This section reads, in part, as follows:
"* * * Notwithstanding the form or tenor thereof, and in the absence of an express recital on the face thereof that the bond is nonnegotiable, all refunding bonds shall at all times be, and shall be treated as, negotiable instruments for all purposes."
Notwithstanding the fact that the bonds in this case may have all of the "qualities and incidents" of negotiable instruments, the payment of the principal and interest thereof is specifically limited to a special fund set forth in the bond itself and this limitation is binding upon the bondholders and all others dealing in such bonds.
The findings of fact by the Chancellor as set forth in the final decree, as to the feasibility of the plan, sufficiency of revenues and all other questions, are amply sustained by substantial evidence as shown by the record.
This case has been ably briefed and argued. We have carefully considered every question presented and raised by the assignments of error, in the briefs, and in the oral arguments before the Court. It has *664 not been made to appear that there was any error in the final decree entered by the Chancellor.
The final decree appealed from should be and is hereby affirmed.
ROBERTS, C.J., HOBSON and DREW, JJ., and HOLT, Associate Justice, concur.
TERRELL, J., and PARKS, Associate Justice, dissent.
PARKS, Associate Justice (dissenting).
The pledging of the gross receipts from the parking meters (except reservation of portions thereof for purchase of new meters) for 30 years or during the life of the bonds with a covenant that rates will be fixed in a sufficient amount to meet such debt service is nothing less than an attempt to barter away the police power. The installation and operation of the meters is strictly a governmental function as distinguished from a proprietary one. Its exercise must always remain fluid  subject to legislative or municipal change at any time  and no legislature or municipality by its action can tie the hands of future legislatures or municipal officials in the exercise of the power. This being so the inclusion of the meters along with the lot in the parking facility in nowise supplies the want of power to pledge. The ownership of the lot and its parking lot operation is an exercise of the proprietary function while the meter operation retains its status of a governmental function. The gross receipts of the meters are not pledgable for any purpose. They may not even be pledged, or otherwise disposed of, to purchase additional meters or enlarge or expand their operation.
In a general sense the facility consisting of the lot and the meters is only one operation, the purpose and object of which is to regulate, control and relieve the congestion of traffic, but such operation does not warrant the pledging of the funds derived solely from the charges authorized by the legislature for parking on the streets. Such pledging as a part of the facility is no less an abdication of the police power. Furthermore, the legal basis for the charges requires all funds derived from them (except incidental profits) be used in the meter operation  their purchase, supervision and general operation, and their diversion to other uses as attempted by the pledging sweeps away the basic justification for them. The supplying by the city of the necessary costs of the meter operation from other sources would, likewise, remove all basis for the charges. Moreover, the funds so supplied by the city would have to come from its general revenue and would seem to circumvent the constitutional provision prohibiting issuance of bonds without the vote of the freeholders. In dealing with the gross receipt funds it can hardly be said that it is a penny-ante business  $90,000 or thereabouts per year for the life of the bonds, even with the low value dollar, is substantial business.
If State v. Miami Beach, Fla., 47 So.2d 865, be construed, as argued by appellee, to authorize any pledging of the funds collected from the meters, then this Court should now turn about and retrace its steps. It is not clear to me that such was the holding of a majority of the Court. If there was a digression from the doctrine governing the basic nature of meter charges in that case this Court returned to it in the subsequent case of City of Panama City v. State, 60 So.2d 658. With the inclusion of the meter charges in the pledge the application for validation should not be approved.