93 So.2d 608 (1957)
PANAMA CITY et al., Appellants,
v.
STATE of Florida et al., Appellees.
Supreme Court of Florida, Division B.
March 13, 1957.
*610 Mercer P. Spear, Panama City, and John N. Mitchell, New York City, for appellants.
R.S. Pierce, Jr., Marianna, and James N. Daniel, Chipley, for appellees.
DREW, Justice.
This is an appeal from a final decree of the Circuit Court of Bay County declining to validate $7,000,000 of water front improvement revenue bonds of the City of Panama City, Florida and dismissing the petition of said City of Panama City filed under the authority of Chapter 75, Florida Statutes 1955, F.S.A., for that purpose.
The proceeds to be derived from the sale of the proposed bonds in the principal sum of $7,000,000 were to be used for the purpose of two large water front developments in Panama City, one of which was to be located at the foot of Harrison Avenue along Government Street at St. Andrew Bay for some thirteen hundred and thirty feet and the other to be located in the St. Andrew community extending from the foot of 10th Street along Bayview Avenue for some seven hundred and fifty feet. The land to be used for the construction of the project was to be created primarily over the bottom of St. Andrew Bay by filling in from the Shore seaward. At the time of the petition for validation a part of said lands were owned by the City and the remainder was to be acquired by purchase, gift or condemnation. The Panama City Marina to be constructed upon such filled-in lands was to consist of the following buildings, viz.: city hall, civic auditorium, two concessions buildings, administration building and a marine sales and service building. The St. Andrew Marina was to consist of a concessions building, a marine sales and service building and an administration building. At both of said sites there would be docks, docking facilities, waterways, necessary utilities, large automobile parking areas and other facilities required in connection with the operation of a large marina.
The resolution authorizing the issuance of the bonds and the trust agreement attached to and made a part of said resolution, provides, among other things, that said bonds, both principal and interest, shall be retired solely and exclusively from funds derived from the net revenues of the revenue producing facilities of the project and from the proceeds of excise taxes theretofore authorized by sundry ordinances of said City on the sale of cigarettes, utility services and from license taxes and franchise taxes, such taxes being generally referred to in the resolution and trust agreement and hereafter in this opinion as cigarette taxes, utility services taxes, license taxes and franchise taxes. There is an express agreement in the resolution authorizing the issuance of said bonds that "it will never be necessary or authorized to use the ad valorem taxing power or any other funds of said City to pay the principal of and interest on the Bonds to be issued pursuant to this Resolution, or to make any of the reserve, sinking fund or other payments provided for in this Resolution, and the Bonds to be issued pursuant to this Resolution shall not constitute a lien upon any of the properties of said Municipal Waterfront Improvements or upon any other property whatsoever of the City."
The evidence before the Court showed that the concessions buildings at the Panama City Marina were divided into twenty-one separate shops along a main concourse in which, according to the plans, it was proposed to have such shops as men's sporting goods wear, tackle shops, marine supplies, drug stores, novelty shops, offices for the Chamber of Commerce, travel agent's office, photo shops, beauty shops, *611 etc. The concessions building at St. Andrew's Marina contained twelve shops [some five additional shops were contemplated in a future proposed area] designed to serve generally the same purpose and accommodate the same type of shops as in the Panama City Marina. It was estimated that from a total anticipated revenue for the first year of operation from all sources of $581,000, approximately $129,000 would be derived from rentals for these shops. There were other rentals anticipated from space in the administration and other buildings as well as from the gasoline concession. Other revenues were to be derived from parking meter revenue, boat slip revenue and income of that nature. Slightly more than 20% of the total revenue for the first year, therefore, consisted of rentals to be derived from the various offices and store spaces in the concessions buildings. So much for the percentage of income from this source compared to the overall income.
It appears that of the total project area in both Marinas, the concessions buildings will occupy 1.22% of the total area. These figures appear in the brief of the City and are not questioned or disputed by appellees.
The brief of the City directs its argument primarily to the general proposition that the circuit court erred in declining to validate the bonds and in dismissing the petition. The City asserts it has the statutory authority to acquire and construct the subject improvements under Ch. 11678, Laws of Florida, Extraordinary Session, November 1925, as amended [the City Charter] and Section 167.21, Florida Statutes 1955, F.S.A. Pertinent portions of such laws relied upon by the City and to which we shall allude hereafter are as follows:
"Section 9. That the commission shall have the power to acquire by gift or purchase and to have possession of, hold and use any real estate or personal property of any and all kinds whatsoever, including docks and recreational facilities * * * or any other public uses or purposes whatsoever of the city or its inhabitants or visitors, and if found desirable or expedient may sell, lease, rent or otherwise dispose of all or any part of same for the benefit of the city. * * * It may acquire by purchase, gift or otherwise, and may lease, receive, hold and use real or personal property beyond the city limits, * * * for the establishment and maintenance of * * * auditoriums * * * which the commission may deem necessary and proper." Sp.Acts 1953, c. 29398. (Emphasis supplied.)
"Sec. 10. That the said City is hereby delegated authority to exercise the right and power of eminent domain * * * for the following uses and purposes: * * * for city building * * * and other municipal purposes * * *."
"Sec. 11. The said City shall have full power and jurisdiction over * * * waters within the City limits; * * * to control, manage and designate the use of all docks, wharves or piers within the City limits * * *."
"Sec. 144. * * * The City Commission shall have the power, within or without its corporate limits to construct, condemn, purchase, acquire or lease, and to maintain, conduct, and operate within and without the corporate limits, wharves * * * ship channels, breakwaters * * *."
Section 167.21, F.S.A. reads in part as follows:
"167.21 Wharves, vessels, bridges, ferries, fires, improvements. The city or town council may construct wharves, quays and docks; regulate wharfage, dockage, and the moorings and anchorage of vessels within the corporate limits, unless otherwise provided by law; construct bridges, establish ferries, and fix the rates of ferriage *612 and tolls; erect all necessary public buildings and control and dispose of the same as the interests of the city or town may require; * * * and do and perform all such other act or acts as shall seem necessary and best adopted to the improvements and general interest of the city or town." (Emphasis supplied.)
Appellees insist, however, (1) that the foregoing laws do not confer the necessary authority upon the City to make the proposed improvements and that such improvements may not be made in the absence of an enabling act of the Legislature specifically authorizing and contemplating such improvements. Moreover, appellees say (2) that the circuit court properly dismissed the petition because a substantial portion of such improvements will be places of business to be leased by the municipality to private corporations and individuals for the operation of various types of business from which substantial sums of money will be received thereby removing said improvements from that type where such private business purposes were wholly incidental to the main purpose. It is also urged by appellees (3) that the construction of said improvements and the leasing of the same to private individuals for the purpose of operating private businesses amounts to obtaining money for or a loan on the credit of the municipality to and for the benefit of such private lessees in violation of Section 10 of Article 9 of the Constitution of Florida. F.S.A. We shall address our views to the propositions of appellees in the order named.
With reference to the contention that the City is without authority to construct the contemplated improvements in the absence of an enabling act of the Legislature specifically authorizing such work, we think the answer to the substantial part of this question is found in State v. City of Clearwater, 1938, 135 Fla. 148, 184 So. 790, 794. As we analyze appellees' argument they make no challenge to the power of the City under the quoted sections of the city charter and the general law to construct the city hall, the auditorium, the wharves, docks and substantially all of the other portions of the project except the so-called concessions buildings and the filling in of the land along the water front. As to the power to construct the docks, wharves and generally to build the marina, as we construe the term in its narrowest sense, we think State v. City of Clearwater, supra, is clearly controlling. The charter provision relied on to build the yacht basin for the City of Clearwater is no broader in its scope  in fact not as all-inclusive  as the charter powers of the City of Panama City which we have quoted. But in that case we specifically held that a yacht basin was a combination of some of the facilities expressly authorized in the Clearwater charter and that "its construction, operation and maintenance come within the purview of the legislative authorization." We therefore hold that the City has the legislative authority under the quoted sections of its charter to construct the docks and build and operate the marina in its narrowest sense and having such authority, it is authorized to issue its bonds for the purpose of financing the undertaking. State v. Clearwater, supra.
We do not deem it necessary to labor the question of whether the city hall and civic auditorium is a municipal purpose and may be lawfully constructed by Panama City. Nor do we understand that there is any serious contention of appellees that this may not be done. The authority to do so clearly appears in the quoted provisions of the charter. It is urged, however, and strongly so by appellees that the City lacks the authority to build up land in the bay and direct and operate what amounts to a general business center consisting primarily of the concessions buildings and certain other phases of the improvement project. Section 9 of the city charter, supra, authorizes the City "to acquire by gift or purchase and to have possession of, hold and use any real estate * * *" for public purposes and to "sell, lease, rent or otherwise dispose *613 of all or any part of same for the benefit of the city." The City also has power under Section 10, supra, to condemn lands for public buildings or other municipal purposes and under Section 11 it has jurisdiction over the waters within the city limits with power to control, manage and designate the use of all docks, wharves or piers. We think it clear under the cited sections of the city charter that the City has the power to condemn lands along the edge of navigable waters for public purposes and having thus acquired the title thereto to extend the same by filling in accordance with the provisions of the applicable statutes of this State. Section 271.01, Florida Statutes 1955, F.S.A., expressly vests in riparian owners the right to make such fills. It is to be noted that the terms of said act expressly cover "land owned by * * * any municipality * * * lying upon any navigable stream or bay of the sea or harbor * * *." That act further provides that upon such fill being made in accordance with its provisions and that of the other laws of the State relating thereto, the title to such filled in lands shall thereupon vest in the riparian proprietor. See Trustees of Internal Improvement Fund v. Claughton, Fla. 1956, 86 So.2d 775; Holland v. Fort Pierce Financing & Construction Co., 1946, 157 Fla. 649, 27 So.2d 76 and Hayes v. Bowman, Fla., 91 So.2d 795. We think it clear, therefore, and hold that the City of Panama City does have the authority under existing law to carry out that portion of the project which authorizes the acquisition of title to uplands and the filling in of the same from the shore seaward, the construction of bulkheads and the necessary works in connection therewith.
We have already noted that the record shows that estimated rentals from spaces in the concessions buildings for the first year will amount to slightly more than 20% of the total anticipated revenue for the first year and that the concessions buildings will occupy 1.22% of the total area involved in both projects. Appellees urge that such concessions buildings and the income therefrom and certain other alleged non-essential elements of the project are so substantial in their nature that it cannot be said that they fall within the exception laid down by this Court in Gate City Garage v. City of Jacksonville, Fla. 1953, 66 So.2d 653, 659, and the cases following that where we held that improvements of this kind may be incorporated in a public project to long as they "are mere incidents to the main or primary purpose of the buildings [and] are for the convenience of those who use the buildings or facilities for a public purpose." To put it another way, appellees say that this phase of the project is so substantial that it in effect destroys the public nature of the entire project and being so interlaced and interwoven therewith that the entire project contemplates an improvement not of a municipal or public nature within the contemplation of the charter of the City and the Constitution and laws of this State.
It is apparent at the very outset of the consideration of this proposition that the difference presented in this case from that which appeared in Gate City Garage v. Jacksonville, supra, is one of degree and not of kind. The development of the law in this State on this question and particularly a study of the legislative history with relation to public projects of a recreational and entertainment nature reveals the allowance to the public bodies of an extremely wide latitude in this field. Compare for instance the cases of State v. City of Miami, Fla. 1954, 76 So.2d 294; State v. Inter-American Center Authority, Fla. 1955, 84 So.2d 9; and State v. Daytona Beach Racing and Recreational Facilities District, Fla. 1956, 89 So.2d 34 where the projects authorized by the Legislature and approved by this Court were much broader than that contemplated by Panama City in this instance. In those cases we upheld the power of the authority to issue bonds and while in State v. Inter-American Center Authority and State v. Daytona Beach Racing and Recreational Facilities District, the act involved was a special act of the Legislature specifically authorizing the bonds, we are unable to see any substantial difference in *614 this case where we now hold that legislative authority exists for the primary improvement and that bonds may be issued therefor. The evidence before the trial court, which we have examined carefully, substantiates the proposition that facilities of the kind contemplated are a necessary adjunct to the successful operation of the main enterprise, namely the marina. This being true, it follows that such business is at least in that respect incidental to the operation of the marina. It is not the principal purpose of the undertaking. Compared to the overall project it is casual, minor and of secondary importance. It is an appendage, to so speak and therefore "an incident to the main or primary purpose and for the convenience of those who use * * * the facilities for a public purpose."
We do not attach much significance to the small area to be occupied by the concessions buildings. Nor can we agree that the amount of rent to be derived therefrom is of such great importance. The main factor, as we view it, is that these concessions buildings and the businesses to be operated therein are required to insure the success of the main undertaking. Nor can the fact be overlooked that while these concessions buildings will be owned and leased by the City, the businesses to be carried on therein, as we understand the record, will not be operated by the City but as private enterprises. See Sunny Isles Fishing Pier, Inc., v. Dade County, Fla. 1955, 79 So.2d 667.
It is, therefore, our conclusion, and we so hold, that the construction of the concessions buildings as contemplated in the overall plan does not destroy the public nature of the project nor prevent the issuance of bonds therefor.
The conclusion we reach in the immediately preceding paragraph constitutes an adverse answer to the third point presented by appellees to the effect that such improvements therein alluded to are in violation of Art. IX, Section 10 of the Florida Constitution.
One other matter, while not seriously urged by appellees, we think should be answered. And that concerns the power of the City to pledge the cigarette tax, utility service tax, license tax and franchise tax to the payment of these obligations in the event the revenues derived from the project are unable to meet the requirements of principal and interest as they severally become due. All of these questions have been answered in previous opinions of this Court. For instance, so far as the power to pledge the cigarette taxes are concerned, see State v. City of Coral Gables, Fla. 1954, 72 So.2d 48; as to the utility service taxes, see State v. City of Winter Park, 1948, 160 Fla. 330, 34 So.2d 740; as to the franchise taxes, see State v. City of Pompano Beach, Fla. 1950, 47 So.2d 515, and in State v. Monroe County, Fla. 1955, 81 So.2d 522, 523, we said with reference to the general proposition of excise taxes, "We have repeatedly held that revenue bonds issued for a public purpose, payable solely from revenues derived from the utilities service, excise taxes, licenses or other sources than ad valorem taxes, do not require an approving vote of the freeholders under Section 6, Article IX of the Constitution." (Emphasis added.) See also Welker v. State, Fla., 93 So.2d 591, for the most recent and very thorough consideration of this question. We affirm the holdings in the above cases and conclude here that insofar as the pledge of the various excise taxes referred to in the resolution of the City and the trust indenture made a part thereof as a cushion against a default in the bonds by virtue of lack of sufficient revenue of the project itself, such pledge is a valid and lawful one under the above and other decisions of this Court.
We want to particularly emphasize that there is no pledge of the ad valorem taxing power in this case nor can there be any lien against the project itself. This is assured *615 by the provisions of the bond resolution and trust indenture and constitutes the very foundation for our holding that these bonds will constitute, when issued, valid obligations of the City of Panama City to the extent and only to the extent authorized by the aforesaid resolution and trust indenture.
We conclude with the observation that it is not within our province to pass upon the wisdom of the actions taken by the City of Panama City in the issuance of these obligations. Nor is it within our power to change the settled law of this State under which the elected officials of the City have the power to issue bonds of the character herein described and construct the contemplated improvements without the previous approval of the citizens. In the able brief of appellees much concern is expressed over the ever-expanding pattern of issuing revenue bonds by the various local governments and authorities in this State without the approving vote of those who must ultimately pay the freight, and the use of such funds for questionable public purposes. The concern expressed by appellees may be well founded but the law in this field has been developed to the point that the power clearly exists in the City to issue bonds of this type absent an approving vote and to use the proceeds thereof as contemplated. It is true that the project here under consideration is wide in scope and embraces activities and facilities to a much greater degree and extent than that in many of the issues which we have considered on previous occasions. But, as we have pointed out, the difference is one of degree and not of kind. On previous occasions we have said that the power of the Legislature over municipal corporations in this State is plenary and that the Legislature may not only grant powers but it may prohibit the exercise of powers. North Shore Bank v. Town of Surfside, Fla. 1954, 72 So.2d 659, 662. In the case just alluded to, we specifically said that it was in the power of the Legislature to "create a municipality and prohibit the issuance by it of any bonds of any nature whatever." If there is to be a change in the law of this State with reference to the power of the cities to issue revenue bonds without an approving vote of the freeholders or with reference to the type of facilities that may be constructed with public money, that change should come from the Legislature. See also State v. City of Fort Pierce, Fla. 1956, 88 So.2d 135.
The decree appealed from must be reversed and the cause remanded with directions to enter a decree of validation as provided by Chapter 75, Florida Statutes 1955, F.S.A.
TERRELL, C.J., and HOBSON and O'CONNELL, JJ., concur.