113 So.2d 374 (1959)
CITY OF WEST PALM BEACH, Florida, Appellant,
v.
STATE of Florida, etc., et al., Appellees.
Supreme Court of Florida.
June 24, 1959.
*375 Egbert Beall and C. Robert Burns, West Palm Beach, for appellant
Phil D. O'Connell and Paty, Downey & Daves, West Palm Beach, for appellees.
PER CURIAM.
This suit was instituted by petition of the City of West Palm Beach to validate an issue of special obligation bonds, the proceeds to be used for the construction of a civic center composed of (1) an auditorium with seating capacity of 3,000; (2) restaurant, (3) a marina with docks for private vessels, charter vessels and marine shops, (4) stores, (5) large swimming pool with separate wading and diving pool, (6) grandstand to accommodate 1,500 persons, (7) offstreet parking lot for 1,100 automobiles, (8) central recreation building, (9) artificial beaches, private dressing rooms, food service and related facilities and (10) a fuel station to cost $50,000. Along with these items were unpaid interest and principal on 1947 bonds, administrative costs, landscaping, engineering, incidentals and other contingencies amounting in all to approximately $7,500,000.
Certain taxpayers were permitted to intervene and answer the petition. The state attorney also filed an answer to the petition. Both answers resist validation of the special obligation bonds. On the issues so made, trial was had before the court who denied the prayer to validate. This appeal is by the City of West Palm Beach from the final decree refusing validation of the bonds.
As is often the case, the parties are not in agreement as to content of the questions presented. Appellant rests its contention on two points and states them as follows:

Point One. Where a total municipal civic center special obligation bond issue of $7,500,000 to erect on one site a combined recreation center, civic auditorium, *376 parking facility and marina, a portion of the issue is to be used to erect marine shops at the slipside of the marina at a cost of $468,000, and where it appears that there is competent testimony that such shops at such location are essential for the success of the main civic center undertaking, does the fact that such civic center site lies in the general neighborhood of the main business section of such city make the use of such bond funds for marina shop purposes an illegal expenditure of public funds, and cause the proposed bond issue and the proceedings in connection therewith to be void?

Point Two. Where in the circumstances stated in Point One, it also appears that the civic center is to be leased under statutory authority to a private corporation, does such lease amount to such an improper subsidy of private enterprise with public money as to make void the proposed bond issue, and the proceedings in connection therewith under Section 10, Article IX of the Florida Constitution [F.S.A.] or other pertinent legislation?
We treat points one and two together because they arise from the same factual complex, turn on the interpretation of the same statutory and constitutional provisions and the same cases are relied on by appellant to support its contentions. Casual reading of appellant's point one reveals a purpose to construct a civic center composed of the facilities recited in paragraph one of this opinion, total cost to be $7,500,000. Included in this and attached to the marina were marine shops to cost $468,000 essential to the success of the civic center. The contention of appellant is that since the marine shops are essential to the success of the civic center, the fact that they are near the business part of the City of West Palm Beach and are to be constructed with a portion of the proceeds of the bonds should not render the bond issue and all proceedings taken thereunder invalid.
By appellant's second point it contends that since it is authorized by statute to lease the civic center to a private corporation, the said lease cannot be said to be an improper subsidy of private enterprise with public money so as to void the proposed bond issue as being in contravention to Section 10, Article IX, Constitution of Florida. Appellant urges that its contentions as to points one and two require a negative answer and relies on Panama City v. State, Fla. 1957, 93 So.2d 608; and State v. Daytona Beach, Fla. 1956, 89 So.2d 34; Raney v. City of Lakeland, Fla. 1956, 88 So.2d 148; State v. Inter-American Center Authority, Fla. 1955, 84 So.2d 9; State v. City of Miami, Fla. 1954, 72 So.2d 655, are also cited as secondary authority to support appellant's contention.
Appellant points out that § 3(45) of its charter, Chapter 24981, Laws of Florida, Acts of 1947, when read in conjunction with § 169.01, Florida Statutes, F.S.A., vests it with ample power to construct the civic center. An examination of these statutes certainly reveals authority for appellant to issue bonds and construct civic projects of different kinds, but in this case the primary resistance to validation of the bonds and construction of the civic center is grounded on the manner in which its construction lease and administration collides with other statutory and constitutional provisions.
Under the Project Agreement and Ordinance 644, the city, among other things, agreed with Flagler Marine Center Corporation to issue special obligation bonds of the city in the sum of $7,500,000 to pay expense of constructing the civic center. When constructed the city agreed to lease the civic center to Flagler Marine Center Corporation, and to pay principal and interest of said bonds, the city pledged the net revenues received from the operation of the civic center. In case the net revenues were insufficient to pay principal and interest on the bonds for each fiscal year, then all monies received, collected and derived from the utilities service tax in the next succeeding fiscal year would be deposited by this *377 city with a trustee as an additional pledge for the payment of the principal and interest of said bonds.
Appellees first contend that the proposed bonds and contract between the city and Flagler Marine Center Corporation to lease and administer the civic center are in violation of Section 10, Article IX of the Constitution, in that they amount to an appropriation of the city's funds or a loan of its credit to private enterprise.
It is not possible to treat the questions raised without consideration of Ordinance 644 and the project agreement between the city and Flagler Marine Corporation referred to previously. The latter provides, among other things, that the corporation shall have the power to make all rules and regulations affecting the use of the civic center. By such an agreement the city surrenders control of the civic center to the corporation, allowing it to make such changes and impose such conditions on its use as it may deem fit and proper.
Section 10, Article IX of the Constitution, in part provides that "[t]he Legislature shall not authorize any county, city or borough, township or incorporated district to become a stock holder in any company, association or corporation, or to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution or individual." The charter of the City of West Palm Beach unquestionably authorizes it to construct municipal projects and issue bonds for their payment, but that power has limitations in the charter and the State Constitution which may not be transgressed.
The chancellor considered some of these limitations on the power of the city when he entered his final decree upon the pleadings, testimony and argument of counsel as follows:
"The procedure whereby public funds are used to aid or promote individuals or private corporations in private enterprise is a dangerous and undemocratic course, and may not be followed except where it is clear and unmistakable that such private enterprise is a necessary adjunct to some proper public function. In the case at bar, because of the close proximity of the marina project to the main business district of West Palm Beach, where numerous stores, hotels, restaurants and all sorts of shopping facilities are readily available, it is highly doubtful that similar facilities at the site of the marina are a necessary adjunct thereto.
"Under the circumstances in this case, the plan now in question is an improper subsidy of private enterprise with public money, and cannot be sanctioned."
The basis of the chancellor's holding that "the plan now in question is an improper subsidy of private enterprise with public money, and cannot be sustained," was the factual finding in the final decree as tested by the inhibition in the Constitution. It also finds ample support in Section 10, Article IX of the Constitution. Section 5, Article IX of the Constitution is of like import since it contains an inhibition against the city imposing taxes for any other than "municipal purposes."
The fourth question offered by appellees to rebut the contention of appellant is predicated on § 14(15) of the city charter which provides:
"The city is forbidden to subscribe for stock in any railroad company or in any other corporation or to give or lend money, aid or credit, except in caring for the poor or distressed, to any person or corporation whatsoever, and it is prohibited from employing or appropriating the revenues and taxes of the city in any manner other than for purposes strictly municipal according to the provisions of this section, provided that the provisions of this section shall in nowise be construed as to *378 alter or change the powers of the commission granted in subsection (38) of section 3 of this Act."
Inspection of this provision of the city charter as affected by the applicable provisions of the Constitution discloses similar inhibitions on the city. In the case at bar they must be read in connection with the agreement the city made with Flagler Marine Center Corporation for lease and operation of the civic center. The lease was for 30 years with renewal privilege for equal period. We have previously called attention to the fact that under the Flagler Marine Center Corporation contract the city surrendered control of the civic center to the corporation despite the fact that the city proposes to issue $7,500,000 in bonds to construct it. Under these facts and the governing law, we see no escape from the charge that the city is using $7,500,000 of the taxpayers' money to provide a facility for lease to Flagler Marine Center Corporation in direct opposition to the applicable provisions of the statute or city charter and the Constitution.
Certainly there are points of similarity between the case at bar and Panama City v. State, supra, relied on by appellant. In the latter, Panama City agreed to issue $7,000,000 in revenue bonds to construct the marina but the city withheld management and control of it. It hired out the various units of which it was composed for a valuable consideration. The fact that the city retained control of the project and leased the various units was the theory on which this court held that it did not violate Section 10, Article IX of the Constitution. The chancellor in this case based his decree on the ground that the means provided for creating and administering the civic center were in conflict with private enterprise. The chancellor consistently employed the term "private enterprise," but he could have as consistently said the manner in which it was proposed to lease the civic center was in conflict with Section 10 Article IX of the Constitution.
We now direct our attention to the assertion of the appellees that the pledge of the utility tax is illegal.
The resolution authorizing the issuance of the subject bonds pledges to the payment thereof (if necessary to retire said obligations) the proceeds of the utility service tax as well as the income to be derived under the plan set forth and the pertinent exhibits attached to retire the principal and interest on the subject obligations. If, as urged upon us by the appellees here, the city is without authority to support these bonds by a pledge of such utility tax, on this ground alone we would be required to affirm the decree of the chancellor refusing to validate said bonds.
In the city's reply brief the proposition is met head on by the following statement:
"We are frank to say that if the City's only authority to issue these bonds is Section 14 (originally numbered 12) of the Charter, the bond ordinance to the extent it pledges contingently the proceeds of the utility service tax does not comply therewith. We reiterate what we said in our main brief that the plain expressed intent of said Section 14 is that it is a non-exclusive method and does not deny the City the right to use the powers granted by Section 3(45) of the Charter and Section 169.01, Florida Statutes."
The basic charter of the city of West Palm Beach is Chapter 24,981, Special Laws of Florida, Acts of 1947. Section 12 of that act concerns revenue bonds, certificates, etc. It defines revenue bonds to mean certain obligations issued by the city pursuant to said section or pursuant to any other law, as supplemented by or in conjunction with said section. It authorizes the city to "prescribe, revise and collect rates, fees, tolls or charges for the services, facilities or commodities furnished by such undertaking, and in anticipation of the collection of the revenues of such undertaking, to issue revenue bonds to *379 finance" the same. Said section further empowers the city "to pledge to the punctual payment of said bonds and interest thereon, all or any part of the revenues of such undertaking (including the revenues of improvements, betterments, or extensions thereto, thereafter constructed or acquired, as well as the revenues of existing systems, plants, works instrumentalities and properties of the undertaking so improved, bettered or extended) or of any part of such undertaking." Said section contains an express prohibition that "no encumbrance, mortgage or other pledge or property of said municipality is liable to be forfeited or taken in payment of said bonds, and provided no debt on the credit of said municipality is thereby incurred in any manner for any purpose." It is further provided in said section with reference to revenue bonds that such bonds "shall not be payable from or charged upon any funds, other than the revenue pledged to the payment thereof, nor shall the municipality be subject to any pecuniary liability thereon." It is further provided "no holder or holders of any such bonds shall ever have the right to compel any exercise of the taxing power of the municipality to pay any such bonds, or the interest thereon, nor to enforce payment thereof against any property of the municipality, nor shall any such bonds constitute a charge, lien or encumbrance, legal or equitable, upon any property of the municipality. Each bond issued under this section shall recite in substance that said bond, including interest thereon, is payable solely from the revenue pledged to the payment thereof, and that the holder of said bond shall have no recourse to the power of taxation."
This section of the charter contains a paragraph fixing its own rules of construction as follows:
"(11) Construction Of Section.  The powers conferred by this section shall be in addition and supplemental to, and not in substitution for, and the limitations imposed by this section shall not affect the powers conferred by any other general or special law. Bonds may be issued under this section without regard to the provisions of any other general or special law, except as herein otherwise provided. Except as herein otherwise provided, the undertaking may be acquired, purchased, constructed, reconstructed, improved, bettered and extended, and bonds may be issued under this section for said purposes, notwithstanding that any general or special law may provide for the acquisition, purchase, construction, reconstruction, improvement, betterment and extension of a like undertaking, or the issuance of bonds for like purposes, and without regard to the requirements, restrictions, debt or other limitations or other provisions contained in this or in any other general or special law, including but not limited to, any requirement for the approval by the electors, taxpayers, or voters of the municipality (unless an election on the issuance of such bonds is required under the Constitution), and any restriction or limitation on the incurring of indebtedness or the issuance of bonds. Insofar as the provisions for this section are inconsistent with the provisions of any other general or special law, the provisions of this section shall be controlling." Chapter 24,981, Special Laws of Florida, Acts of 1947, Section 12.
The city contends, however, that its power to issue revenue bonds is not limited by Section 14 (originally numbered 12) of the city charter from which we have quoted at some length but that it has the power to issue the subject bonds and pledge thereto the utility tax under the authority of Section 169.01, Florida Statutes 1957, because of the power granted to the city by Section 3(45) of the city charter, viz.:
"(45) Enumeration Of Powers Herein Not Exclusive. The enumeration of particular powers in this charter shall *380 not be deemed or held to be exclusive, but in addition to the powers enumerated herein, implied thereby, or appropriate to the exercise thereof, said City of West Palm Beach shall have and may exercise all other powers which are now, or may hereafter be possessed or enjoyed by cities under the Constitution and general laws of this State, and all of the powers of said city, whether expressed or implied, shall be exercised and embraced in the manner prescribed in this charter, or when not so prescribed, then in such manner as may be provided by ordinance or resolution of the commission." Chapter 24,981, Special Laws of Florida, Acts of 1947, Section 3.
A careful analysis of Section 14 leads inescapably to the conclusion that revenue bonds of the city may be issued for the purpose of providing funds to construct the projects therein described, but that said bonds must be retired solely and exclusively from the revenues of the project itself or the extensions and additions thereto. The portions of the act which we have heretofore quoted support no other conclusion. It would have been a simple matter for the Legislature to have provided the power to pledge other revenues to the payment of said bonds had it been their intention so to do. Nowhere in Section 14, nor in other places in the charter, do we find, nor has any been cited, any authorization for the city to pledge any of its assets other than the revenues of the project itself to the payment of revenue bonds. And, as we pointed out in the case of North Shore Bank v. Town of Surfside, Fla., 72 So.2d 659, by virtue of its plenary powers over municipalities, the Legislature may not only grant powers but may prohibit the exercise of powers. In that case we held that, under the charter of the Town of Surfside, which is quite similar to the charter provisions of West Palm Beach in this case and the general plan of which (so far as revenue bonds are concerned) is almost identical, revenue bonds of said town issued for the purpose of constructing an addition to its public bathing facilities and pledging revenues to be derived from a franchise tax, were invalid because of the requirements of the city charter that only the revenue to be derived from the provision would be pledged to the payment of said bonds. What was said in that case is equally applicable to this. Also cf. State v. City of Fort Pierce, Fla. 1956, 88 So.2d 135. Moreover, if any doubt remained that it was the legislative intent to prohibit the pledge of anything other than the revenues to be derived from the project for the payment of revenue bonds of the city, such doubt was removed by Chapter 27975, Special Acts of 1951, which expressly authorized the city commission of West Palm Beach to pledge "any part or all of the utility service tax * * * for the payment of principal and interest of revenue bonds of the city to be issued for any lawful purpose." It is true that this act was not to become effective except upon the approval of the voters at a referendum election therein provided for. It must be assumed, however, that the act did not become effective else this question would undoubtedly not be present in this case. Whether it became effective or not, the passage of the act, considered in the light of the pertinent portions of the basic city charter, make it crystal clear that it was the legislative intent to prohibit the pledge of such tax to the payment of revenue bonds. If this were not so, there would have been no purpose whatever in the enactment of the 1951 statute.
Having reached the conclusion that the decree appealed from must be affirmed for the foregoing reasons, we do not deem it necessary to explore the other questions raised by appellees.
Affirmed.
TERRELL, C.J., and THOMAS, ROBERTS, DREW and THORNAL, JJ., concur.