140 So.2d 576 (1962)
STATE of Florida et al., Appellants,
v.
CLAY COUNTY DEVELOPMENT AUTHORITY, a Body Corporate and Political Subdivision of the State of Florida, Appellee.
No. 31354.
Supreme Court of Florida.
March 7, 1962.
Rehearing Denied March 22, 1962.
William A. Hallowes, III, Jacksonville, for appellants.
Scruby & Yonge, Orange Park, and Patterson, Freeman, Richardson & Watson, Jacksonville, for appellee.
DREW, Justice.
This appeal by the State of Florida (hereafter referred to as the State) questions a final decree validating $500,000 of revenue anticipation certificates proposed to be issued by the Clay County Development Authority (hereafter referred to as the Authority)[1].
In 1958, the Authority acquired a surplus airfield consisting of approximately 1300 acres of land located in Clay County and known as Fleming's Island Satellite Field. Thereafter the Authority acquired certain rights to public recreational facilities on Kingsley Lake in Clay County and has leased certain facilities therein to Doctor's *577 Inlet Civic League, a non-profit corporation which uses such facilities for community projects and recreational purposes. The Authority has granted the use of certain portions of its Kingsley Lake property to the Gateway Council of Girl Scouts. While the legislative act contemplated the development of these lands primarily for public purposes, the only use made of the Fleming's Island Satellite Field property since its acquisition by the Authority is for occasional drag strip racing operated by a private corporation under a contractual arrangement with the Authority. The use of the airport has been limited since its acquisition by the Authority because of certain restrictions placed thereon by the United States Navy, which has extensive facilities in this general area; but it is anticipated that in the near future the Authority will be able to make a more extensive use thereof.
In July, 1961, the Authority entered into a lease agreement with Eclipse Plastic Industries, Inc., a private corporation, whereby the Authority agreed to construct, erect, install and equip an industrial plant on a described portion of Fleming's Island Satellite Field and thereafter to lease such tract, as improved, to the private corporation for a term of sixteen years, with an option to the company to renew said lease at the expiration of said period for an additional term of ten years. In such agreement it was provided that the Authority would finance the cost of building and equipping said plant through the issuance and sale by the Authority of revenue certificates payable solely from the sums to be paid by the company to the Authority over the initial sixteen year term of the lease.[2] It was further provided that the total cost of building and constructing said plant and equipping the same would not exceed the sum of $500,000, and that any sums in excess thereof should be supplied by the lessee. The agreement contained in detail the provisions to be incorporated into the definitive lease including the provisions that the company would have the exclusive use and exclusive control of said premises and property during the entire term of the indenture and any renewals thereof and that the premises would be used in the operation of the business of manufacturing plastic containers and other plastic products, subject only to the restrictions and limitations of the definitive lease. The lease, as above mentioned, was to include a provision that the company should have the option at the termination thereof to renew the same for an additional term of ten years and that, during such additional term, the terms and provisions of the original lease would be applicable except that thereafter that rents should be at an annual rate of $15,000 per year, payable $1250 monthly.
Following the execution of the agreement to lease above mentioned, the Authority adopted a resolution approving the execution of such agreement and authorizing the construction and erection of the building and equipment mentioned therein and above specified and the issuance of $500,000 in revenue anticipation certificates to finance the cost thereof. Petition was thereafter filed to validate such certificates, a final decree was entered by the Circuit Judge adjudging the same to be valid, approving the project above described and finding that the purpose for which such certificates were to be issued was a public purpose.
The Act creating the Authority defines "project" as:
"(2) `Project' shall be deemed to mean and include the acquisition of lands, properties and improvements for development, expansion and promotion of industry, commerce, agriculture, natural resources and vocational training and the construction of buildings and plants for the purpose of selling, *578 leasing or renting such structures to private persons, firms or corporations."
Among others, the following powers and duties are specifically conferred upon the Authority:
"* * * (4) To acquire in its own name by purchase, on such terms and conditions, and in such manner as it may deem proper, real property or liens or easements therein or franchises necessary or convenient for its corporate purposes, and to use the same, and to lease or make contracts with respect to the use or disposition of same in any manner the authority deems to its best advantage. * * *
* * * * * *
"(6) To make contracts, and to execute all instruments necessary or convenient, including contracts for construction, lease, rental and sale of projects or contracts with respect to the use of projects which it erects or acquires.
"(7) To construct, erect, acquire, own, repair, remodel, maintain, extend, improve, equip, operate and manage projects, self-liquidating or otherwise, located on property owned or leased by the authority, and to pay the cost of any such project from the proceeds of revenue-anticipation certificates of the authority or from any grant from the county of Clay or any of the incorporated cities therein, or from any grant from the state, or from any contribution or loan by persons, firms, or corporations, all of which the authority is hereby authorized to receive and accept and use.
* * * * * *
"(10) To do all things necessary or convenient to carry out the powers expressly conferred by this act.
* * * * * *
"(12) To issue revenue-anticipation certificates for the purpose of paying all or any part of the cost of any project of the authority. Such revenue-anticipation certificates shall be issued and validated under and in accordance with the applicable provisions of the laws of Florida."
The original Act was before this Court in quo warranto proceedings brought in the name of the Attorney General of the State of Florida questioning the powers of the Authority.[3] This Court in this quo warranto proceeding upheld the powers vested in the Authority and determined that the same were not necessarily violative of the Constitution. In this connection, however, it is necessary to observe, as was done in the later case involving the Suwannee County Development Authority,[4] that we were not dealing with the direct question of the power to issue revenue bonds nor a specific exercise of a specific power under the Act. The Court expressed the view that the Clay County Development Authority "was created to and will serve a valid public purpose in providing for the over-all development of Clay County. The setting aside for industrial and commercial purposes of a portion of the property already purchased is certainly a part of the balanced over-all plan for the County's development; but there is nothing in the record here to show that this was the primary purpose for the acquisition of the federal government's surplus tract of land, rather than an incidental part thereof. In these circumstances we can find nothing in the previous decisions of this court construing § 10 of Article IX requiring us to hold that the Authority's acquisition of the property and proposed program for its development amounts to an appropriation of the Authority's funds for, or the lending of its credit to, a private enterprise." 104 So.2d p. 349 (Emphasis added) As a basis for the above observation of this Court, the Court leaned heavily upon Gate *579 City Garage, Inc. v. City of Jacksonville[5] and Panama City v. State.[6] In connection with our approval of the sale or lease of portions of the authorities' properties for industrial or commercial purposes to private persons, firms or corporations, we must examine those cases in order to determine whether what is proposed to be done in the specific instance involved in this appeal was what this Court had in mind in the Cotney case.
In Gate City Garage, the Court was concerned with the question of the power of the City of Jacksonville to lease a filling station to a private person on a portion of the land being developed for public purposes by the issuance of certain municipal obligations. The holding of this Court there was that, inasmuch as this reservation of power in the plan for the development of this municipal project was a pure incident to the main or primary purpose of developing large parking areas (a concededly public purpose), the lease of the filling station to private individuals did not destroy the main or primary public purpose. Later, in the Panama City case, in dealing with an identical question, this Court, after finding that the estimated rentals from spaces to be leased in the marina there under consideration would amount to slightly more than 20% of the total anticipated revenues of the overall public project and that the concessions buildings would occupy 1.22% of the total area involved in the project, concluded "that the construction of the concessions buildings as contemplated in the overall plan does not destroy the public nature of the project nor prevent the issuance of bonds therefor." 93 So.2d p. 614
Reverting now to the Cotney case, while this Court approved in that case the power of the Authority to sell or lease certain parts of the Authority's property for industrial or commercial purposes to private persons, firms or corporations, that holding was necessarily limited to such projects as were embraced within our holdings in the Gate City and Panama City cases. This conclusion is inescapable from the following summarization of our holding:
"* * * When construed as authorizing the sale or lease for industrial and commercial purposes of a portion, only, of a tract of land acquired as a single project encompassing recognized public purposes as the primary object of the acquisition; or as authorizing the construction of improvements on such property for utilization by private enterprises as an incident to and in furtherance of a primary and recognized public purpose, cf. Gate City Garage, Inc., v. City of Jacksonville, supra, 66 So.2d 653; Panama City v. State, supra, 93 So.2d 608, we find no constitutional infirmities in the Act." 104 So.2d p. 349.
In State v. Suwannee County Development Authority,[7] supra, this Court declined to approve the validation of revenue certificates issued to purchase a single tract of land on which an industrial plant was to be constructed and leased to a private concern. In commenting upon the Cotney case in that opinion, Mr. Justice O'Connell, speaking for this Court, clearly pointed out the importance of noting that there was no proposed issue of revenue certificates involved in the Cotney case. Among other things this Court observed:
"In the Cotney case it is important to note that there was no proposed issue of revenue certificates before this Court. In that case the Clay County Development Authority, which was created by a special act of the Legislature almost identical to that which created the Authority here involved, had already acquired a large tract of surplus land from the federal government *580 It proposed to develop that land as one project to include an airport and golf course with the remainder to be leased or sold to private enterprise for commercial use. This Court held that there was nothing in the record to show that the leasing or selling to private enterprise for private use of a portion of the lands was the primary purpose for the acquisition of the lands. Rather the court held the private use was only an incident thereto. * * *
* * * * * *
"Thus it is obvious that although the Court approved the validity of an act granting such an Authority the power to purchase, construct, and lease to private enterprise it severely restricted such authorization to those instances where the private use was only incidental to a public purpose and public use of the remaining greater portion of the lands involved."
Turning now to the question immediately at hand, it is crystal clear that the primary purpose to be served by the issuance of these obligations is the financing of a private enterprise contrary to the express provisions of Section 10 of Article IX of the Constitution of this State, F.S.A.[8] The public obligation is to be incurred for the sole purpose of building and equipping this industrial plant. The fact that such building and structures will occupy only a small portion of the 1300 acres of land of the Authority is of no consequence in determining whether the purpose of improvement is incidental and falls within the ambit of our holdings in the Gate City Garage and Panama City cases. The dominant and paramount purpose is to lend the credit of the county to a private corporation to finance a private enterprise for private profit which will be under the exclusive control and in the exclusive possession of such enterprise for more than twenty-five years. The only possible public purpose which it serves is to promote the general development of the area by furnishing employment to the residents of Clay County. This is the factor which prompted the project. If we approve the issuance of bonds by the public authorities of this State to build and finance private enterprises and put such enterprises in the exclusive possession and control of such leases as is proposed to be done here, in order to alleviate unemployment and to promote the economic development of the area, then there is no limit to the extent to which the credit of the State and its authorities may be extended to private interests. In such event the constitutional provision above quoted will become meaningless.
In two cases involving legal principles identical with those involved here, this Court has clearly rejected the idea that private enterprise may be financed in the manner proposed here. In State v. Town of North Miami,[9] certificates of indebtedness were issued by the Town of North Miami to purchase certain lands in the city limits and to construct thereon an aluminum manufacturing plant. The property was then to be leased for twenty years to a private corporation under an agreement whereby such private corporation would carry on a manufacturing enterprise for private property upon the premises with the certificates to be retired by income from the net rentals to be received from the construction. The plan is almost identical to that involved here. We quote and reaffirm the observations of Mr. Justice Mathews *581 writing for the Court in that case as follows:
"* * * In none of the cases decided by this Court since the adoption of our present Constitution have we approved any special legislative acts which authorized any of the political subdivisions or governmental units of the State to acquire property and erect buildings thereon for the exclusive use of a private corporation for private gain and profit.
* * * * * *
"Our government was founded upon the firm foundation that private property cannot be taken except when it will serve a public purpose. Section 1 of the Declaration of Rights of the State Constitution provides, that, `all men * * * have certain inalienable rights, among which are those of * * * acquiring possessing and protecting property * * *.' If private property may be purchased by the municipality for the use and benefit of a private corporation, then it may be acquired by the great power of eminent domain for such a purpose. A first essential for the acquirement of private property by this great power is, that it shall be for a public purpose. See Peavy-Wilson Lumber Co. v. Brevard County, 159 Fla. 311, 31 So.2d 483, 172 A.L.R. 168.
"Our organic law prohibits the expenditure of public money for a private purpose. It does not matter whether the money is derived by ad valorem taxes, by gift, or otherwise. It is public money and under our organic law public money cannot be appropriated for a private purpose or used for the purpose of acquiring property for the benefit of a private concern. It does not matter that such undertakings may be called or how worthwhile they may appear to be at the passing moment. The financing of private enterprises by means of public funds is entirely foreign to a proper concept of our constitutional system. Experience has shown that such encroachments will lead inevitably to the ultimate destruction of the private enterprise system." 59 So.2d pp. 784, 785.
In City of Clearwater v. Caldwell,[10] a similar project was undertaken by the City of Clearwater and this Court held that the City had no power to lease lands to construct hotel and apartment houses for private gain and declared the same to be violative of Section 10, Article IX of the Constitution. In City of West Palm Beach v. State,[11] this principle was reaffirmed in a factual situation much stronger in support of validation than this case presents.
We have carefully considered the argument of the Authority that the validation of these bonds is warranted by the rationale of this Court in a number of our previous decisions.[12] We have carefully examined each of these cases and find no similarity between the questions there presented and the one now under consideration. Each of those cases involved the issuance of governmental obligations for what had been long determined by this Court in previous cases to be public purposes. State v. *582 Daytona Beach, for example, involved the issuance of certificates to construct racing and recreational facilities. In that case we again referred to the fact that, while the facilities were proposed to be leased to private corporations for a portion of the year, such leases were incidental to the public purpose of providing recreational facilities. In State v. Board of Control it was said that the primary purpose of the issuance of the obligation was the promotion of the educational facilities of this State; and the Court again observed "if the real and dominant purpose of the project was the promotion of a private enterprise for private gain, the contention of the appellants would be sound." These are but two of the cited cases but each of the others clearly sets forth a dominant public purpose and we approved the validation on the theory that whatever private purpose was served was purely incidental to the main public purpose. We find in none of these cases comfort to the Authority. On the contrary, each of these cases supports the conclusion which we reach that the certificates proposed to be issued for the construction of the proposed project are condemned by Article IX, Section 10, of the Constitution and that the decree of the trial court must be and the same is hereby,
Reversed.
ROBERTS, C.J., and THOMAS and O'CONNELL, JJ., concur.
CALDWELL, J., concurs specially.
TERRELL and THORNAL, JJ., dissent.
CALDWELL, Justice (concurring specially).
I concur in the opinion and judgment of Mr. Justice DREW.
This case may be distinguished from the Gate City Garage matter wherein, as an incident to a publicly constructed parking facility, a service station, constructed at the time and in the same manner, was leased for private operation. In that case there was an interdependence between the parking area and the service station. In the case now under consideration, the private business sought to be served is in nowise interdependent upon the remainder of the area owned by the Authority.
In the absence of some substantial and functional relationship between the private business and the other lands and activities of the Authority, it must be held that the primary purpose of the Authority is to benefit private enterprise.
ROBERTS, C.J., and THOMAS and DREW, JJ., concur.
TERRELL, Justice (dissenting).
I concur with the dissent of Mr. Justice THORNAL wherein he says in effect that this is not a case where a unit of government proposes to employ public funds to acquire and develop an isolated tract of land for private benefit as was the case in State v. Town of North Miami, Fla., 59 So.2d 779; City of Clearwater v. Caldwell, Fla., 75 So.2d 765, and like cases. The chancellor, as did said dissent, pointed out that not one cent from the public treasury of the Authority was pledged to support the certificates in question; that no lien on the property was imposed to support them, but that their sole security was limited to rents derived from the building proposed to be constructed with the proceeds of the certificates. The public credit was in no sense bound to pay principal or interest on them.
In addition to this, I am content to plant my dissent squarely on the doctrine of State v. Dade County, Fla., 62 So.2d 404; City of Clearwater v. Caldwell, Fla., 75 So.2d 765; my dissent in State v. Suwannee County Development Authority, Fla., 122 So.2d 190, and my dissent in Gate City Garage, Inc. v. City of Jacksonville, Fla., 66 So.2d 653, and on other cases in which *583 this court distinctly approved the doctrine that when the overall purpose of an act is to accomplish a public purpose, it will not be held invalid because there is wrapped in it the incidental means to effectuate a private purpose. We have so often recognized this rule that the citation of cases to support it would hardly seem necessary.
I think the case at bar falls clearly within this line of cases which distinguish it from State v. North Miami, 59 So.2d 779, and like cases, by reason of which I must dissent.
THORNAL, Justice (dissenting).
I regret that I find it necessary to dissent. My view is that our precedents support the validity of the proposed revenue certificates.
State ex rel. Ervin v. Cotney, Fla. 1958, 104 So.2d 346, was a direct attack on the validity of Chapter 57-1226, Laws of 1957. This was the statute which created the appellee Clay County Development Authority. In the cited case we upheld the statute against the very assault which the appellant levels against the proposed financing plan. In construing the statute in Cotney we found that the Authority proposed to utilize all of the property which it had acquired "as one project in the overall program of integrated development of Clay County." The Court specifically acknowledged that the public purpose was the general development of the county by devoting the land to various uses. Among the uses which we expressly approved was the exercise of the power to sell or lease portions of surplus land "to private concerns as sites for industrial or commercial plants."
In defining the public purpose and in approving the incidental uses of the land, some of which could benefit private interests, we held in Cotney:
"We have no doubt that the Clay County Development Authority was created to and will serve a valid public purpose in providing for the over-all development of Clay County. The setting aside for industrial and commercial purposes of a portion of the property already purchased is certainly a part of the balanced over-all plan for the County's development; but there is nothing in the record here to show that this was the primary purpose for the acquisition of the federal government's surplus tract of land, rather than an incidental part thereof. In these circumstances we can find nothing in the previous decisions of this court construing § 10, of Article IX requiring us to hold that the Authority's acquisition of the property and proposed program for its development amounts to an appropriation of the Authority's funds for, or the lending of its credit to, a private enterprise."
In approving the construction of improvements on a portion of the land with ultimate utilization by private enterprise, we held in Cotney:
"When construed as authorizing the sale or lease for industrial and commercial purposes of a portion, only, of a tract of land acquired as a single project encompassing recognized public purposes as the primary object of the acquisition; or as authorizing the construction of improvements on such property for utilization by private enterprises as an incident to and in furtherance of a primary and recognized public purpose, cf. Gate City Garage, Inc., v. City of Jacksonville, supra, 66 So.2d 653; Panama City v. State, supra, 93 So.2d 608, we find no constitutional infirmities in the Act."
As I interpret the majority opinion, the Court appears to hold that the Authority cannot now do the exact thing which we have already told them that they could do.
As the majority seems to concede, we have many times held that if the over-all objective of a program is to accomplish a recognized public purpose, then an incidental private benefit will not adversely *584 affect its validity. As I read State v. Cotney, supra, we specifically held that the comprehensive over-all development program contemplated by the appellee Authority pursuant to the Act of the Legislature would effectuate a recognized public purpose, to wit: the economic and cultural improvement and betterment of Clay County and its municipalities.
This is not a case where a unit of government proposes to employ public funds to acquire and develop an isolated tract of land for private benefit. State v. Town of North Miami, Fla., 59 So.2d 779; City of Clearwater v. Caldwell, Fla., 75 So.2d 765. In those cases the private benefit was primary and the public benefit was remote and incidental. Here the Authority already owns extensive parcels of land which are or will be developed for admittedly public activities. It is now proposed to improve a part, a "small portion" according to the validating decree, of one tract in the manner outlined in the resolution authorizing the certificates. Not one cent from the public treasury is pledged to these certificates. No tax in any form is committed to the securities. No lien on the property is granted to support the issue. The sole source of funds to liquidate the certificates is expressly limited to the rental income to be derived from the building which would be constructed. In no fashion is the public credit obligated or committed.
To pinpoint the public purpose to be promoted by the appellee Authority let us refer to Section 12, Chapter 57-1226, the authorizing statute, which reads:
"Construction.  This act, being for the purpose of developing and promoting the public good and the welfare of the county of Clay and the incorporate cities therein and their inhabitants, shall be liberally construed to effect the purposes thereof."
At the risk of burdening the reader by an extended quotation, I feel that the basic justification for the Authority's program and the public purpose which it serves, is best demonstrated by the validation decree, where the trial judge found:
"2. Clay County is predominantly a rural, agricultural community. Its economic welfare has historically been based on truck farming, timber and related enterprises. Until recently, no industry and few commercial opportunities have been available to the residents of the County. Except for the presence of Navy Personnel, existing labor is unskilled and no means are available by which the residents may be trained to become skilled craftsmen. This problem has recently been aggravated by the decision of the Navy to close its `mothball Fleet' based at Green Cove Springs. Such action is calculated to result in a severe dislocation of the County's economy.
"3. The Authority in the discharge of its duties, as prescribed by the Legislature, and in order to meet the problems created by the economic forces presently at work in the County has embarked on an overall program designed to re-develop its economic and general welfare. It has obtained the use of a portion of Camp Blanding for development as a youth recreational area. It has rendered assistance in the establishment of a Civic Club for the Doctors Inlet community. It contemplates the development of the Camp Blanding Youth Area for use by the Boy Scouts, 4 H Clubs, Future Farmers of America and other youth organizations. It has acquired from the United States, by purchase, a large tract of surplus real estate on Fleming's Island. The Authority proposes to utilize this property as one project in the overall County re-development program. It is planned to construct thereon an airport, a golf course and a farmers market. In this connection the Federal Aviation Agency has proposed the removal of the restricted use of the air space over *585 this property, thus opening this area to widespread use for private and commercial flying. However, the Authority is likewise concerned with the County's industrial and commercial development. A portion of the Fleming's Island property is ideally situated for these purposes and properly constitutes a part of the balanced overall plan of the Authority. Accordingly, the Authority has actively sought to attract light industry in locating in this area. It has agreed with Eclipse Plastic Industries, Inc. to construct and equip on a small portion of the Fleming's Island property an industrial plant which will be leased to this company for a period of years. In order to acquire the funds for this construction, the Authority proposes to issue certificates of indebtedness payable from the rentals to be paid by the tenant. Such purpose is public in nature rather than private. The acquisition of the land initially was for a recognized public purpose. The utilization of a portion of this property by private enterprise, on the basis above described, is but an incident to and in furtherance of the primary and recognized public purpose which justifies the expenditure of public funds * *." (emphasis added)
While endowed with few, if any, attributes of government the Authority is legislatively declared to be a public corporation. Nevertheless, it has no power to tax, no police power, no power of eminent domain, and it cannot create a public debt as such. The Attorney General in State v. Cotney, supra, questioned this very same statute, in an obvious effort to eliminate doubts regarding the Authority's powers. He contended that the Act violated Section 10, Article IX, Florida Constitution, because it authorized the acquisition and development of public property for private purposes. This Court, in no uncertain terms, overruled the point when it held that the construction of improvements on a part of the previously acquired land and the leasing thereof to private concerns would be a mere incident to the over-all public purpose which permeated the entire statute, to wit: the improvement and development of Clay County. I feel that appellee Authority was authorized to proceed in reliance on that decision. It now appears to me that without expressly receding from the clear holding in State v. Cotney, supra, we are reversing our position. We are telling the Authority that it has no power to accomplish that which, less than three years ago, we told them it was their function to accomplish in the public interest.
I have mentioned two of the decisions now relied upon by the majority. City of Clearwater v. Caldwell, supra; State v. Town of Miami, supra. The principle of those decisions was considered in Cotney and held inapplicable because the public bodies there involved were proceeding to acquire one particular parcel of land for the sole purpose of making it available to private enterprise. There was no over-all long-range plan for community development with an incidental use of a relatively small parcel of a larger tract for so-called private purposes. In State v. Suwannee County Development Authority, Fla., 122 So.2d 190, the basic deficiency in the proposal which was struck down, simply was that no plan whatever was offered. The public agency merely proposed to borrow money for some unexplained and unidentified future use. In City of West Palm Beach v. State, Fla., 113 So.2d 374, the vital weakness in the financing scheme was a contingent pledge of the City's utilities tax. Such a pledge was prohibited by a charter provision which limited the permissible security for revenue certificates to the actual income from the project, in the absence of freeholder approval. None of the defects in the plans considered in the opinions relied upon by the majority are present in the instant case.
We have here a broad, general, but nonetheless clear-cut public purpose. The transaction which is here proposed and which is struck down by the majority is merely *586 an incident to the conceded public purpose which we recognized and approved in Cotney. I frankly can see little, if any, fundamental distinction between the proposal of the appellee Authority and methods of financing heretofore approved by us in other cases. In State v. Dade County, Fla., 1953, 62 So.2d 404, this Court authorized the Dade County Port Authority to raise money to construct a large warehouse and overhaul shop on its public land for immediate rental to an airline. The importance of Miami International Airport to the economic well-spring of the community was considered to be a sufficient public purpose to support the incidental attachment of this benefit to private enterprise. In our Cotney decision we recognized the economic importance of the long-range program of the appellee Authority, in the economic and community development of Clay County. In Sunny Isles Fishing Pier v. Dade County, Fla., 1955, 79 So.2d 667, we approved the leasing of a publicly owned fishing pier to a private enterprise for development by private capital. Recreation was held to be the important public purpose which supported the incidental private benefit. In the instant case the promotion of recreational activities in Clay County is one of the significant projects of the appellee Authority. In State v. Inter-American Center Authority, Fla. 1955, 84 So.2d 9, we agreed that a public agency could raise money on revenue certificates to construct a vast trade center which would be leased to concessionaires and others as a part of a plan to promote and encourage international trade in the Miami area. This admittedly important potential economic contribution to the community was held to be a valid public purpose. Similarly, in our Cotney opinion we viewed the potential economic development of Clay County as an important public purpose which would be served by the appellee Authority. In State v. Daytona Beach Racing and Recreational Facilities District, Fla., 1956, 89 So.2d 34, we permitted a public recreational district to issue revenue certificates to raise money to construct a speedway which would be leased to a private enterprise for six months out of each year for a period of forty years. We based our approval on the view that recreation and the attraction of visitors was an important public function in the particular area. We specifically recognized with approval, the findings contained in the enabling statute which expressly stated "its purpose was to further public purposes in promoting the economic, commercial and residential development of the District * * *." In other words, in the case last cited, we committed ourselves to the proposition that the promotion of the general economic commercial and residential development of an area is a valid public purpose. Also in the case last cited we distinguished State v. Town of North Miami, supra, and, City of Clearwater v. Caldwell, supra, on the identical basis which I have mentioned as distinguishing aspects in this case. When such is established then an incidental private benefit will not condemn the accomplishment of the comprehensive public objectives.
It seems to me that inasmuch as we have held that the broad economic development of an area is an unquestionable public purpose, we must inescapably reach the conclusion that the basic functions of the appellee Authority and the broad objectives which it has set out to accomplish should likewise be affirmed as public purposes. In fact, we so found in State v. Cotney, supra. Having arrived at this conclusion, the incidental development of a relatively small portion of the composite land holdings of the appellee for the benefit of a private enterprise, should not condemn the instant proposal as violative of the organic law. This should certainly follow when the private aspect of the project is so clearly consistent with the approved public objectives.
I would, therefore, approve the proposed securities by affirming the decree of the trial judge. In consequence of this view, I respectfully dissent.
NOTES
[1] The Authority was created by Chapter 57-1226, Laws of Florida, Special Acts of 1957.
[2] The total annual income to the Authority from the lease was the identical amount required to pay principal and interest on the bonds for that year. At the expiration of the sixteen year term, the total anticipated income from such rentals would then have fully paid off the original issue of certificates.
[3] State ex rel. Ervin v. Cotney, Fla. 1958, 104 So.2d 346.
[4] State v. Suwannee County Development Authority, Fla. 1960, 122 So.2d 190.
[5] Gate City Garage, Inc. v. City of Jacksonville, Fla. 1953, 66 So.2d 653.
[6] Panama City v. State, Fla. 1957, 93 So.2d 608.
[7] Note 4, supra.
[8] "§ 10. Credit of state not to be pledged or loaned.  The credit of the State shall not be pledged or loaned to any individual, company, corporation or association; nor shall the State become a joint owner or stock-holder in any company, association or corporation. The Legislature shall not authorize any county, city, borough, township or incorporated district to become a stockholder in any company, association or corporation, or to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution or individual."
[9] Fla. 1952, 59 So.2d 779.
[10] Fla. 1954, 75 So.2d 765.
[11] Fla. 1959, 113 So.2d 374.
[12] Among others, the following cases are relied on by the Authority: Bailey v. City of Tampa, 92 Fla. 1030, 111 So. 119; Brautigam v. White, Fla. 1953, 64 So.2d 781; City of Jacksonville v. Savannah Machine & Foundry Co., Fla. 1950, 47 So.2d 634; Kathleen Citrus Land Co. v. City of Lakeland, 124 Fla. 659, 169 So. 356; Leon County v. State, 122 Fla. 505, 165 So. 666; Seaboard Air Line R. Co. v. Peters, Fla. 1949, 43 So.2d 448; State v. Board of Control, Fla. 1953, 66 So.2d 209; State v. City of Miami, Fla. 1954, 76 So.2d 294; State v. Dade County, Fla. 1953, 62 So.2d 404; State v. Daytona Beach Racing and Recreational Facilities District, Fla. 1956, 89 So.2d 34; State v. Inter-American Center Authority, Fla. 1955, 84 So.2d 9; Sunshine Const. of Key West, Inc., v. Board of Commissioners, Fla. 1951, 54 So.2d 524.